GROUP INSURANCE COMPANY OF MICHIGAN v CZOPEK

Docket No. 90390. Argued January 8, 1992 (Calendar No. 11). Decided September 9, 1992.

Group Insurance Company of Michigan brought a declaratory action in the Wayne Circuit Court against Don A. Czopek and Herdis B. Petty, police officers, and Arthur A. Smith, the son of its insured under a homeowner's policy, seeking a determination whether it was obligated to defend or indemnify Arthur Smith on a charge of assault and battery for the injuries he inflicted while intoxicated upon the police officers when he resisted arrest. The court, Richard P. Hathaway, J., granted summary disposition for the plaintiff. The Court of Appeals, MacKenzie and Reilly, JJ. (Murphy, P.J., dissenting), affirmed in an unpublished opinion per curiam (Docket No. 99005). The Supreme Court, in lieu of granting leave to appeal, remanded the case for reconsideration in light of *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656 (1989), and to consider whether forcibly resisting arrest is an occurrence under the policy, regardless of whether injury was intended or expected from the standpoint of the insured. On remand, the Court affirmed in an unpublished opinion per curiam, finding that there was no occurrence within the meaning of the policy and that even in light of the "intended or expected" standard of *DiCicco,* the incident fell within the exclusionary clause of the policy (Docket No. 127020). The officers appeal.

In an opinion by Justice MALLETT, joined by Chief Justice CAVANAGH, and Justices BRICKLEY, RILEY, and GRIFFIN, the Supreme Court *held:*

An intoxicated person may form the intent to purposely injure others so as to exclude coverage under a homeowner's

REFERENCES

Am Jur 2d, Insurance §§ 708, 709.

Liability insurance: intoxication or other mental incapacity avoiding application of clause in liability policy specifically exempting coverage of injury or damage caused intentionally by or at direction of insured. 33 ALR4th 983.

Construction and application of provision of liability insurance policy expressly excluding injuries intended or expected by insured. 31 ALR4th 957.

insurance policy. Intoxication does not vitiate or mitigate that intent. In this case, Arthur Smith intended to injure the officers in some manner when he resisted arrest; thus, because there was no "occurrence" under the policy, coverage is barred.

1. Terms used in an insurance policy must be clearly defined within the policy or be given their commonly used meaning. Omitting the definition of a word that has a common usage does not create an ambiguity within the policy. While general exclusions to liability are to be strictly construed against the insurer, clear and specific exclusions must be enforced. An insurance company may not be found liable for a risk it did not assume. In this case, the provisions of the policy are clear and unambiguous.

2. The language of this policy provided coverage on behalf of the insured for all bodily injuries caused by the insured that constituted an occurrence, i.e., an accident, including injurious exposure to conditions that results in bodily injury or property damage. Case law has held that an accident is an undesigned contingency, something that happened by chance. Smith's action in forcibly resisting arrest was not an accident and, thus, not an occurrence under the policy. Therefore, coverage is barred.

3. An intoxicated person can be liable for acts committed. Such acts might be said to be unintentional for purposes of insurance policy coverage. Willing consumption of an intoxicating substance may not be used as a defense to the requirement of intent in an insurance policy. Arthur Smith consumed a significant amount of alcohol, a fact that does not render his resisting arrest accidental or excuse his assault of the officers. Thus, his actions are not covered under his parents' homeowner's policy.

Justice BOYLE, concurring, stated that because the insurance contract does not require an examination of the accidental nature of the event from the insured's perspective to determine whether the accident that resulted in the officers' bodily injuries was an occurrence, it must be viewed from the officers' perspective. So viewed, the injuries received by the officers were the result of an accident and, therefore, were caused by an occurrence, further requiring an examination of the intentional-acts exclusion of the policy. Because the insured intentionally resisted arrest and intended or expected to injure the officers, his acts fall squarely within the intentional-acts exclusion. Thus, the insurer owed the insured no duty to defend.

Affirmed.

Justice LEVIN, dissenting, stated that this case is insuffi-

ciently clear to allow a finding by the Supreme Court that there was no occurrence, as defined in the policy. In light of *DiCicco* and the record in this case, the Court could not presume that Smith intended the injury or find that his actions were the type that must have resulted in the injury. Because Smith testified that he did not intend to injure the officers, it is a question of fact whether, assessing the extent to which he was intoxicated, he had formed, or was capable of forming, the requisite intent to injure them.

INSURANCE — HOMEOWNER'S POLICIES — EXCLUSIONARY CLAUSES — INTOXICATION.

An intoxicated person may form the intent to purposely injure others so as to exclude coverage under a homeowner's insurance policy; intoxication does not vitiate or mitigate that intent.

*Brandt, Hanlon, Becker, Lanctot, McCutcheon, Schoolmaster & Taylor* (by *Edwin F. Dyer, II*); (*Nancy L. Bosh,* of counsel) for the plaintiff.

*Thomas K. Dipietro Law Offices* (by *Thomas K. Dipietro* and *Ronald M. Haystead*) for defendants-appellants.

MALLETT, J. This is an action for declaratory judgment, seeking to determine the insurer's obligation to defend or indemnify its insured for his liability for injuries he inflicted upon two police officers when he resisted arrest.

We are called upon to consider whether the injuries caused by defendant Arthur Smith's assault on two police officers constituted an "occurrence" as required by plaintiff's homeowner's policy. We also consider whether intoxication can turn an intentional act into an accidental one under the insurance policy language.

I

On New Year's Eve, 1983, eighteen-year-old Arthur Smith went out with a friend, bought a

twelve-pack of beer, and drove around awhile drinking. Smith drank six of the twelve beers in approximately thirty to forty-five minutes.

Smith and his friend then went to a New Year's Eve party where Smith drank two more beers and a pint of peppermint schnapps, except for four shots drunk by a friend.

About 11:00 P.M., Smith left the party and began walking home. He knew that he was drunk and that his speech was slurred. Officer Czopek, a defendant in the instant action, testified that he saw Smith walking down the center of Gudith Road, weaving from side to side. As a result, Smith was interfering with traffic and putting himself at great risk.

Officer Czopek stopped his car, turned around, and drove back down the road. He pulled up next to Smith and tried to talk him into getting off the road. Smith refused and became belligerent. Czopek then made a U-turn, radioed for back-up assistance, and watched Smith.

Smith turned off the road and began to walk across a field to avoid the traffic light at the corner of West and Gudith Roads. He then tried to cross West Road. As he started to cross the street, he dove or fell into the westbound lane of traffic. Officer Czopek drew even with Smith and again told him to get out of the road. Smith again began shouting at the officer.

Czopek turned into a nearby driveway near Smith, got out of the car, and called to Smith. Instead of listening to the officer, Smith stopped and, as Czopek approached, began shouting that he had to go home because his father was going to kill him. Officer Czopek tried to calm him down, but Smith grabbed him by the lapels. Czopek then realized that Smith was extremely drunk.

When Corporal Herdis Petty arrived on the

scene, Smith became hostile and belligerent. The two policemen tried to handcuff Smith. The struggle which ensued lasted nearly one hour. Smith lay on the ground and kicked and swung his legs. As the two police officers tried to put him into the police car, he wrapped one leg around part of the car while still kicking with the other. Each time they got him partially in the car, Smith tried to get out.

As a result of their struggle with Smith, Officers Czopek and Petty suffered injuries. Officer Czopek suffered frostbite on one of his hands; Officer Petty had some ribs broken where Smith kicked him. Smith also bit his hand.

Smith admitted that he knowingly resisted arrest because he did not want to go to jail. However, he did not recall kicking or hitting anyone and, because of this, did not think he harmed either officer. He admitted, however, that he intended to resist arrest.

Smith was charged with assault and battery, and was fined $250 at his criminal trial.

The officers filed a civil suit against Smith's parents. Group Insurance Company of Michigan (GICOM) was the parents' homeowner's insurer. It filed the instant action, asking the court to declare that it was not required to defend or indemnify Arthur Smith. Trial judge Richard Hathaway granted GICOM's motion for summary disposition. The Court of Appeals affirmed the lower court's decision in an unpublished opinion per curiam.

In lieu of granting leave to appeal, this Court remanded the case to the Court of Appeals for reconsideration in light of *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656; 443 NW2d 734 (1989), and to discuss whether forcibly resisting arrest can be considered an "occurrence" within the policy language, regardless of whether

the injury was intended or expected from the standpoint of the insured.

On remand, the Court of Appeals again found in an unpublished opinion per curiam in favor of GICOM. According to the panel, there was no "occurrence" within the meaning of the policy. Further, the panel found that even in light of the *DiCicco* "intended or expected" language, the incident fell within the exclusionary clause of the policy.

Officers Czopek and Petty filed an application for leave to appeal in this Court on November 16, 1990. We granted leave to determine whether the injuries suffered were the result of an occurrence. Further, we consider whether an intoxication can vitiate making the insured's actions "accidental" under the policy.

We find that Arthur Smith's actions were intentional, and therefore there was no "occurrence" as defined within the policy. Further, we find that an intoxicated person can intend the results of his actions. Thus, an intoxicated person's actions need not be considered "accidental" under the policy. We affirm the decision of the Court of Appeals in favor of plaintiff GICOM.

II

The first step in determining if an insurance policy applies is to determine whether the policy is clear and unambiguous on its face. If an ambiguity exists, the policy must be construed in favor of the insured. *Powers v DAIIE,* 427 Mich 602, 624; 398 NW2d 411 (1986). Under the heading Coverages, the policy at issue states:

COVERAGE E—PERSONAL LIABILITY
This Company agrees to pay on behalf of the

Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence.

The next heading in the policy is "Exclusions," under which the following appears:

This policy does not apply:
1. Under Coverage E—Personal Liability and Coverage F—Medical Payments to Others:

* * *

f. to bodily injury or property damage which is either expected or intended from the standpoint of the Insured.

On the same page, under the heading "Additional Definitions," the policy provides:

5. "occurrence": means an accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.

The terms used in an insurance policy either are clearly defined within the policy or are given their commonly used meaning. *Fireman's Fund Ins Co v Ex-Cell-O Corp,* 702 F Supp 1317, 1323, n 7 (ED Mich, 1988). Omitting the definition of a word that has a common usage does not create an ambiguity within the policy. We conclude that the provisions in the GICOM policy are clear and unambiguous. We cannot create ambiguity where none exists. *Edgar's Warehouse, Inc v United States Fidelity & Guaranty Co,* 375 Mich 598, 602; 134 NW2d 746 (1965). It is also improper for us to rephrase or interpret the clear and unambiguous language of the policy. Instead, we must enforce the language

of this contract as it is written. *Eghotz v Creech,* 365 Mich 527, 530; 113 NW2d 815 (1962).

Further, the exclusions to the general liability in a policy of insurance are to be strictly construed against the insurer. *Francis v Scheper,* 326 Mich 441, 448; 40 NW2d 214 (1949). Clear and specific exclusions must be enforced. An insurance company cannot be found liable for a risk it did not assume. *Illinois Employers Ins of Wausau v Dragovich,* 139 Mich App 502, 507-508; 362 NW2d 767 (1984); *Kaczmarck v La Perriere,* 337 Mich 500; 60 NW2d 327 (1953).

III

We must consider whether Arthur Smith's assault on officers Petty and Czopek constituted an "occurrence" under the policy. We find that it did not. The policy language supplied coverage on behalf of the insured for all of the bodily injuries caused by the insured that constituted an occurrence. An occurrence is defined by the policy as "an accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage." The meaning of "accident" in insurance policies has been defined as:

> anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected. [*Guerdon Industries, Inc v Fidelity & Casualty Co*

*of New York,* 371 Mich 12, 18-19; 123 NW2d 143
(1963).]

In his deposition, Mr. Smith admitted that he
intended to prevent the arrest. His actions, biting
and swinging his arms and legs, were intended to
make it impossible for the officers to easily get him
into the squad car and on his way to the police
station. Because of Arthur Smith's admission in
his deposition, we are unwilling to conclude that
his resisting arrest, which resulted in injuries to
the policemen, was an "accident." It clearly was
not an undesigned contingency or something that
happened by chance. *Guerdon, supra.* Unlike the
Court in *DiCicco,* we do not find that the factual
situation in this case is so unclear as to allow us to
say that there was an occurrence. Accordingly, we
agree with the Court of Appeals that forcibly
resisting arrest is not an "accident" within the
meaning of the insurance policy's definition of
"occurrence," thus coverage for the officer's inju-
ries is barred under the policy.

IV

The next question before us is whether intoxica-
tion can vitiate intent so that the actor's acts can
be considered accidental under the policy. We
believe that an intoxicated actor can be liable for
his actions, and that such actions might be said to
be unintentional for purposes of insurance policy
language.

Defendant Arthur Smith consumed a substantial
amount of alcohol before he assaulted the police
officers. Yet, he admitted in a deposition that he
knew he was resisting arrest and that two men
were trying to get him into a police car. This
shows that Smith was capable of forming some

intent even though he was significantly intoxicated. Further, he resisted arrest for nearly an hour. Again, it is evident that Arthur Smith was capable of expecting his actions to harm the officers. Mr. Smith's resisting arrest was not rendered accidental simply because he happened to be intoxicated.

The Court of Appeals recently looked at the question of voluntary intoxication in terms of insurance policies and determined that intoxication is not a factor mitigating intent. In *Allstate Ins Co v Hampton,* 173 Mich App 65; 433 NW2d 334 (1988), the plaintiff sought declaratory judgment to establish that it did not have a duty to provide coverage for the defendant under a homeowner's policy. Defendant James Hampton allegedly engaged in sexual relations with his adopted twelve-year-old daughter, and she sued to recover under his homeowner's policy. The policy language excluded coverage for bodily injury that could reasonably have been expected to result from the intentional or criminal acts of the insured or that were intended by the insured.

Defendant Hampton argued that his voluntary intoxication should vitiate intent. The Court of Appeals found that "[w]here an insured voluntarily ingests alcohol, he may not, as a defense to an exclusionary clause in an insurance policy such as the one at bar, assert that he lacked the capacity to form the intent to act or harm." *Id.* at 67.

The panel found support for its position in *Allstate Ins Co v Sherrill,* 566 F Supp 1286 (ED Mich, 1983), where the plaintiff sought declaratory judgment to determine if it was required to provide coverage under a homeowner's policy for a series of outrageous acts committed by the insured. Richard Sherrill's policy contained language that excluded coverage for bodily injury that was ex-

pected or intended from the standpoint of the insured.

Richard Sherrill walked into a convenience store with a gun, robbed the cashier, abducted her, and then violently sexually assaulted the woman. He pled nolo contendere to the charges. However, he claimed that because he had ingested three "hits" of mescaline (an hallucinogen), approximately one and one-half bottles of schnapps, and several bottles of beer, and had smoked two or three marijuana cigarettes before he walked into the store, he could not form the intent necessary to be convicted of the crimes. Sherrill claimed he had no recollection of the crimes he committed that night, that his acute intoxication prevented him from being able to form the intent to harm, and that he lacked the capacity to intentionally act. *Id.* at 1287.

The court did not agree. It stated that public policy required that "a voluntary departure of one's good judgment and rational decision-making abilities should not permit the insured to abrogate his financial responsibility to those he brutally injures." *Id.* at 1288.

The court held that "where an insured voluntarily ingests alcohol or drugs he may not assert a defense to an exclusionary clause such as the one at bar based on his lack of capacity to form the intent to act or harm, where the defense is based solely on the effects of the alcohol and/or drugs." *Id.*[1]

---

[1] See Justice LEVIN's dissent, *post,* p 630, n 27. In *Sherrill,* the court followed an established legal principle. Because no Michigan law existed on the topic, the federal court was required to determine what a Michigan state court would do when confronted with a similar case. The court stated:

Recognizing the lack of judicial guidance on this issue, the Court believes that if confronted with this question the Michi-

We find the reasoning applied by the Courts in *Sherrill* and *Hampton* persuasive. An intoxicated person is responsible for his actions, even though he may have voluntarily ingested intoxicating substances. In the case before us, Arthur Smith, of his own accord, consumed a significant amount of alcohol. He admits that he remembers some of what occurred between him and the police officers. The fact that Smith drank eight beers and a bottle of schnapps does not excuse the fact that he resisted arrest and assaulted two policemen.

The precedent of self-immunity that such a policy would create would allow commission of a crime without the requisite responsibility. Further, to allow voluntary intoxication as a defense in a civil action is also unjust. Where an insured willingly consumes an intoxicating substance, he may not use that consumption as a defense to the requirement of intent in an insurance policy. To allow such a defense would be to create the ability to act unwisely without the requisite financial responsibility. Arthur Smith's actions are not covered under his parents' homeowner's policy because they cannot be considered accidental.

V

We find that, because there was no occurrence resulting from Mr. Smith's actions, coverage for the injuries suffered by the officers is barred. Further, it is possible for an intoxicated individual to form the requisite intent to purposely injure others. Intoxication does not vitiate or mitigate that intent. Arthur Smith intended to injure officers

gan Courts would be constrained to hold that such a defense is not available to one whose alleged incapacity results solely from a voluntary ingestion of alcohol or drugs. [566 F Supp 1288.]

Petty and Czopek in some manner when he resisted arrest, and therefore, because there was no occurrence, coverage under the GICOM policy is barred.

We therefore affirm the Court of Appeals resolution of this case.

CAVANAGH, C.J., and BRICKLEY, RILEY, and GRIFFIN, JJ., concurred with MALLETT, J.

BOYLE, J. (*concurring*). I agree with the majority that the insurer does not have a duty to defend in the underlying tort action, and I agree that the decision of the Court of Appeals should be affirmed. I also agree that in this context voluntary intoxication does not provide the insured with a defense to the operation of an intentional-acts exclusion. I write separately to state that because the insurance contract does not require an examination of the accidental nature of the event from the insured's perspective to determine whether an "accident" that resulted in the officers' bodily injuries was an occurrence, the accidental nature of the event must be viewed from the officers' perspective. I would hold that the injuries received by the officers were the result of an accident, and that, therefore, the injuries were caused by an occurrence. I would also hold that because the officers' injuries were caused by an occurrence, an examination of the intentional-acts exclusion is necessary. The language of the policy mandates that the insured's subjective intent both to act and to injure be examined relative to the exclusion for intentional injuries. It is not disputed that the insured intentionally resisted arrest and intentionally bit the police officer. Because the insured fought with the officers for almost an hour in subfreezing weather, the officers' injuries were expected or intended from the standpoint of the insured and are therefore excluded from coverage.

I

As the lead opinion sets forth, on remand from this Court the Court of Appeals reversed the decision of the trial court, which had ordered Group Insurance Company of Michigan (GICOM) to defend its insured in the underlying negligence claim. Unpublished opinion per curiam, decided October 26, 1990 (Docket No. 127020). The Court held that "Smith's voluntary ingestion of excessive amounts of alcohol resulting in his forcibly resisting arrest was not an 'accident' within the meaning of the insurance policy's definition of 'occurrence.' " It reasoned that because the insured admitted in his deposition that he intended to resist arrest, and because the insured "described his intentional physical acts of resistance, such as biting the officer," it was "unwilling to hold that his voluntary intoxication and his wilful, unlawful resistance resulting in injury, was an 'accident,' an undesigned contingency or something which happened by chance."

Judge MURPHY dissented and stated that, "the majority on remand has failed to address the issue framed by the Supreme Court." He reasoned that, while an insured may not use voluntary intoxication to avoid an exclusion in an insurance contract, the insured's voluntary intoxication was not relevant to the threshold issue of insurance coverage. According to Judge MURPHY, there simply was nothing in the coverage clause, "the 'occurrence' language," that would "prevent[ ] acts committed by the insured as a result of intoxication from qualifying as occurrences under the policy."

I agree with Judge MURPHY's conclusion. Because the language of the insurance contract does not specify the perspective from which to view an

accident that results in bodily injury,[1] the accidental nature of the incident must be evaluated from the standpoint of the injured person. The officers did not invite Smith's attack, and thus their resultant bodily injuries were "caused by an occurrence." I would further hold that because Smith admitted that he intended to resist arrest and intended to injure the officer by biting him, and because the underlying complaint is based on the insured's intentional acts of "pushing, striking, punching, biting and kicking" the officers, GICOM does not owe its insured, Smith, a duty to defend him in the underlying negligence claim.

## II

"Insurance policies have a common structure." Fischer, *The exclusion from insurance coverage of losses caused by the intentional acts of the insured: A policy in search of a justification,* 30 Santa Clara L R 95, 103 (1990). Policies describe what they cover, "the scope of coverage." *Id.* After defining the scope of coverage, policies contain the " 'take aways,' " or exclusions. *Id.* There are, therefore, two ways in which an insurer may limit its duties toward its insured: it may draft its coverage clause to include only certain events, or it may specifically exclude events through an exclusionary clause. *Id.* at 105.[2]

---

[1] GICOM's policy does not include in its definition of "occurrence" that the accident that results in bodily injury or property damage may not be expected or intended from the standpoint of the insured, language that is often found in the coverage clauses of other insurance policies.

[2] For instance, many insurers limit the scope of coverage to only accidental conduct by drafting the policy's coverage clause in terms of an occurrence as the covered event. "Occurrence" is then defined as "an accident which occurs during the policy period resulting in bodily injury or property damage 'neither expected nor intended from the standpoint of the insured.' " Fischer, *supra* at 105. Where this limita-

The duty to defend exists if the allegations in the underlying complaint "even arguably" fall within acts covered by the policy. *Allstate Ins Co v Freeman* and *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656, 662; 443 NW2d 734 (1989). It is the substance of the complaint that controls, and we focus on the "basis for the injury," *id.,* to resolve the arguable scope of coverage. See also *Illinois Employers Ins of Wausau v Dragovich,* 139 Mich App 502; 362 NW2d 767 (1984); *Reurink Bros Star Silo, Inc v Maryland Casualty Co,* 131 Mich App 139; 345 NW2d 659 (1983).[3]

This is not to say that liability insurance is litigation insurance. The duty to defend is limited by the exclusions in the insurance contract. *Meridian Mut Ins Co v Hunt,* 168 Mich App 672, 677; 425 NW2d 111 (1988). "The insurer is not required to defend against claims for damage expressly excluded from policy coverage. The exception in the policy is part of the contract between the parties." *Id.*

Thus, GICOM has a duty to defend Smith if the acts and injuries alleged in the underlying tort complaint arguably come within the scope of acts and injuries covered under the insurance contract with Smith's parents. If, however, these acts and injuries also fall within the class of acts and injuries expressly excluded by the policy, coverage

tion of the definition of accident does not appear in the coverage clause, insurers have drafted exclusionary clauses that specifically exclude from coverage "injury or loss 'expected or intended from the standpoint of the insured.'" *Id.*

[3] Where several theories of liability are asserted in a complaint, some of which fall within policy coverage and some of which do not, the insurer has a duty to defend if any of the theories asserted would be covered by the policy. *Meridian Mut Ins Co v Hunt,* 168 Mich App 672, 677; 425 NW2d 111 (1988). Doubt regarding the insurer's duty to defend must be resolved in favor of the insured. *Freeman/DiCicco, supra* at 662.

is precluded, and GICOM does not owe Smith a duty to defend in the underlying tort action. As we held in *Freeman/DiCicco, supra* at 668, the analysis of the question "requires that we first determine whether coverage exists, and then whether an exclusion precludes coverage."

### III

The coverage clause in "Section II Coverages" of the policy issued by GICOM provides:

> This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence. This Company shall have the right and duty, at its own expense, to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . .

In the "Additional Definitions" section of the policy, the definition of "occurrence" is:

> [A]n accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.

Coverage exists if the injuries were "caused by an occurrence," that is, if the act was an accident that resulted in bodily injury, it falls within the policy definition of "occurrence." It is not disputed that the officers were injured. GICOM, however, argues that the bodily injuries suffered by the officers were not the result of an accident, and were therefore not a covered "occurrence." I disagree.

In *Freeman/DiCicco, supra* at 670, we defined
"accident" as "an undesigned contingency, a casu-
alty, a happening by chance, something out of the
usual course of things, unusual, fortuitous, not
anticipated, and not naturally to be expected." We
also recognized that an accident is not limited only
to unintentional acts. *Id.* at 670. We had no occa-
sion in *Freeman/DiCicco* to determine from whose
perspective the accidental nature of the event was
to be viewed.

This Court defined "accident" in the context of
an accident insurance policy in *Guerdon Indus-
tries, Inc v Fidelity & Casualty Co of New York,*
371 Mich 12, 18-19; 123 NW2d 143 (1963).

> "An 'accident,' within the meaning of policies of
> accident insurance, may be anything that begins
> to be, that happens, or that is a result which is not
> anticipated and is *unforeseen and unexpected by
> the person injured or affected thereby*—that is,
> takes place *without the insured's foresight or ex-
> pectation* and without design or intentional causa-
> tion on his part. In other words, an accident is an
> undesigned contingency, a casualty, a happening
> by chance, something out of the usual course of
> things, unusual, fortuitous, not anticipated, and
> not naturally to be expected." [Quoting 10 Couch,
> Insurance, 2d (rev ed), § 41:7, p 9. Emphasis
> added.][4]

However, while it is correct in the context of
accident insurance to say that an accident is an
event that takes place "without the *insured's* fore-
sight or expectation and without design or inten-
tional causation on his part," because the insured

4 While this Court in *Guerdon Industries* applied the definition to a
liability insurance policy, the Court was not attempting to categorize
an insured's intentional act as an accident. Nor did the Court specifi-
cally hold from which perspective the accidental nature of the act
must be viewed.

and the injured person are one and the same, see, generally, 43 Am Jur 2d, Insurance, §§ 1-3, pp 73-79, this conclusion does not follow in the context of analyzing a contract of liability insurance. In the latter context, the insured may or may not be the party injured. We therefore look to the words of the insurance contract at issue to determine from which perspective the parties intended to view the accidental nature of the event.

IV

As observed in *Freeman/DiCicco,* before 1966, a split of authority existed regarding the perspective from which to view the accidental nature of the injury claimed.[5] Even where the insured intended to injure the victim, the majority of courts addressing the question held that the accidental nature of the injuries must be viewed from the victim's standpoint.[6] Thus, the injuries were the result of an accident, and the insurer was liable.[7]

Competing policy questions dictated the conflicting results. On the one hand, individuals should not be indemnified for intentional injuries inflicted upon another. On the other hand, injured persons should be compensated for their losses. Viewing the accidental nature of the injury from the victim's standpoint promoted the compensation policy.[8] Those courts viewing the accidental nature of

[5] See *Freeman/DiCicco, supra* at 714-716, Rynearson, *Exclusion of expected or intended personal injury or property damage under the occurrence definition of the standard comprehensive general liability policy,* 19 Forum 513, 521-522 (1984), comment, *The expansion of insurance coverage to include the intentional tortfeasor,* 23 Loyola L R 122, 124-126 (1977), and note, *Intentional injury exclusion clauses —What is insurance intent?,* 32 Wayne L R 1523, 1524-1525 (1986).

[6] Comment, n 5 *supra* at 124.

[7] *Id.*

[8] Note, n 5 *supra* at 1524.

the injury from the insured's standpoint promoted the deterrence policy.[9]

As a result of the competing policies and conflicting decisions, the National Bureau of Casualty Underwriters and the Mutual Insurance Rating Bureau revised the standard policy language in 1966 to make it clear that the accidental nature of the event was to be viewed from the insured's perspective.[10] The industry addressed the possibility of viewing the accidental nature of the event from the victim's perspective by specifically providing that it was to be viewed "from the standpoint of the insured."[11]

Because GICOM's policy is silent with respect to the question from whose perspective the "accident" is to be viewed, we are faced with answering the same question presented before the 1966 revision of liability insurance policy language. While other insurance policies include the viewpoint in their definitions of "occurrence,"[12] the instant policy does not. It provides coverage for "occurrences" and defines occurrences as "accident[s] . . . which result[ ] . . . in bodily injury or property damage."

Where the policy is silent regarding perspective, the court must evaluate the accidental nature of the injury from the victim's perspective. *Ashland Oil, Inc v Miller Oil Purchasing Co,* 678 F2d 1293 (CA 5, 1982). In *Ashland Oil,* the insured carried

[9] *Id.*

[10] Rynearson, n 5 *supra* at 513; comment, n 5 *supra* at 127; note, n 5 *supra* at 1524.

[11] Comment, n 5 *supra* at 127.

[12] For instance, the insurer in *Frankenmuth Mut Ins Co v Piccard,* 440 Mich 539, 547, n 12; 489 NW2d 422 (1992), specifically stated the viewpoint to be used. Its policy provides:

"[O]ccurrence" means an accident . . . which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

liability insurance through two different insurers. One had specified in the policy that the accidental nature of the occurrence should be evaluated from the insured's standpoint and one had not. Because one policy did not specify the standpoint, and because Louisiana case law provided that such occurrences be evaluated from the standpoint of the injured party, the court held that, under the policy that did not specify the perspective, the accidental nature of the occurrence must be evaluated from the victim's perspective. As a result, the intentional injection of hazardous materials into an oil company's pipeline was an "occurrence" under one policy and was not an "occurrence" under the policy that provided that the damage be neither expected nor intended from the standpoint of the insured. *Id.* at 1320-1321.

We have not been directed to, nor has independent research disclosed, decisions in this jurisdiction holding that the accidental nature of an injury is to be viewed from the victim's perspective in interpreting homeowners' insurance policies. However, there is authority that holds that under general automobile liability policies injuries are accidents, even when intentionally inflicted. In *State Farm Mut Automobile Ins Co v Coon,* 46 Mich App 503; 208 NW2d 532 (1973), the Court of Appeals evaluated authority both from Michigan and from other jurisdictions and held that, where the insured intentionally drove his vehicle, striking a pedestrian, the accidental nature of the event should be viewed from the victim's standpoint. The Court noted, however, that if the victim acted as the aggressor, the event would not be an accident, and coverage would not exist.

A law enforcement officer, acting within the scope of his duties, will not be deemed to have been the aggressor in an altercation. *Tomlin v*

*State Farm Mut Automobile Liability Ins Co,* 95
Wis 2d 215; 290 NW2d 285 (1980). Thus, a state
trooper who had stopped a vehicle and was
stabbed by the driver was accidentally injured
under the driver's automobile liability policy. The
court noted that the accidental nature of the
injury must be viewed from the victim's perspec-
tive. This was true in general liability policies, and
the court saw no reason to apply a different rule to
automobile liability policies. Furthermore, where
the officer was acting within the scope of his duties
as a law enforcement officer, he would not be
deemed the aggressor who started the chain of
events that led to his stabbing.

Similarly, where a garage owner shot a person
during a dispute, the injuries were suffered acci-
dentally when viewed from the victim's perspec-
tive. *New Amsterdam Casualty Co v Jones,* 135
F2d 191 (CA 6, 1943). Analyzing and applying
Michigan law, the court held that "whether the
injury is an accident, is to be determined from the
standpoint of the one suffering it, rather than
from the standpoint of the one inflicting it . . . ."
*Id.* at 193. The court stressed, however, that it was
not the insured who was seeking indemnity in this
instance, but, rather, it was the victim who had
attempted to collect a judgment from the insur-
ance company through garnishment proceedings.

In the absence of language in the insurance
contract indicating an intent to the contrary, I
agree that, because the officers were performing
their duties as law enforcement officers, they did
not act as aggressors in the instant case. From the
officers' perspective, Smith's resisting arrest, which
caused frostbite, broken ribs, and a bitten hand,
were all undesigned contingencies, casualties, hap-
penings by chance, out of the usual course of
things, unusual, fortuitous, not anticipated, and

not naturally to be expected. The injuries were the result of an accident, and were, therefore, caused by an occurrence as required for coverage under GICOM's policy.[13]

The policy language itself supports this interpretation. GICOM has made it clear that it is able to specify the viewpoint to be used when it so desires. The intentional-acts exclusion in the GICOM policy expressly states that the bodily injury that results from an insured's acts may not be expected or intended from the standpoint of the insured. Had GICOM wished to expressly provide the perspective from which to view the accidental nature of the injury, it could have done so in the definition of "occurrence."

V

The conclusion that the injuries suffered by the officers were caused by an occurrence does not resolve the question of the insurer's duty to defend. GICOM's policy provides that it does not apply "to bodily injury or property damage which is either expected or intended from the standpoint of the Insured." The language is unambiguous, *Freeman/DiCicco, supra,* and requires that we look to the subjective intent or expectation of the insured to determine whether the officers' injuries will be excluded from coverage. *Id.*

The intentional-injury exclusion applies where the insured intended to act and also intended or expected to injure the victim. *Id.* at 718. Once the intent to act and the intent or expectation to injure are present, it is " 'immaterial that the actual harm caused was of a different character or

---

[13] Because the coverage clause does not specify that the accidental nature of the event that caused the officers' injuries be viewed from the insured's perspective, the insured's voluntary intoxication is simply immaterial with respect to the coverage clause.

magnitude from that intended by the insured . . . .'" *Id.,* quoting anno: *Construction and application of provision of liability insurance policy expressly excluding injuries intended or expected by insured,* 31 ALR4th 957, 973.

While the insured stated that he was surprised to learn that the officers had been injured, he admitted intending to prevent his arrest. He also admitted intending to bite the officer to prevent the officer from "yank[ing] the side of [his] face off." Thus, the insured intended to actively resist arrest, and intended to injure by biting the officer. Once the intent to injure is shown, it is irrelevant that the injury was different from that intended by the insured. Furthermore, the insured fought with the police officers for nearly an hour in subfreezing temperatures. "[T]o claim that the insured did not expect or intend to cause injury 'flies in the face of all reason, common sense and experience.'" *Freeman/DiCicco, supra* at 720, quoting *CNA Ins Co v McGinnis,* 282 Ark 90, 93; 666 SW2d 689 (1984). Certainly all "reason, common sense and experience" tell us that frostbite will occur from exposure to subfreezing temperatures.

Not only has the insured admitted intending to act and intending to injure the officers, but the plaintiffs' complaint does not allege acts that arguably escape the exclusion and come within the policy coverage. We look beyond the nomenclature[14] in the complaint to its substance, *Freeman/*

---

[14] The negligence count in the complaint alleges that Smith

owed a duty to society, and to the Plaintiffs in particular, to abide by all laws and mores of society which include: not to drink excessive amounts of intoxicating liquors, when he knew, or should have known, that he would become intoxicated and as a result, violent; not to present oneself in public in an intoxicated state; not to create danger to himself and others by

*DiCicco, supra* at 663; *Dragovich, supra* at 507, and focus on the "basis for the injury," not the form of the complaint. *Freeman/DiCicco, supra* at 662. See also *Dragovich, supra* at 507.[15]

The underlying complaint alleges that Smith "negligently and repeatedly cause[d] injury to the Plaintiffs by pushing, striking, punching, biting and kicking the Plaintiffs on or about their bodies." While the complaint earlier alleges that, because of his intoxication, Smith "lacked voluntary control over his actions," Smith's own deposition testimony belies this allegation. He admitted biting the officer and admitted resisting arrest. The basis for the officers' injuries, therefore, was Smith's intentional act and not negligence as expressly alleged in the complaint.

---

becoming unruly, violent and dangerous due to excessive consumption of intoxicating liquors; and to obey the lawful commands of a police officer engaged in the lawful scope of his duty.

The complaint further alleges that Smith

breached said duty to society, and to the Plaintiffs in particular, by: becoming so intoxicated that Defendant lacked voluntary control over his actions which resulted in violent, dangerous and unruly behavior; disobeying the lawful commands of police officers engaged in the lawful scope of their duties entrusted to them by society; and by further conducting himself in a negligent and grossly negligent manner so as to actually severely injure the Plaintiffs.

And the complaint alleges that Smith

negligently and repeatedly cause[d] injury to the Plaintiffs by pushing, striking, punching, biting and kicking the Plaintiffs on or about their bodies.

[15] In *Dragovich,* where the victim sought compensation for "injuries he sustained when he was 'struck, pushed or physically assaulted,'" the Court held that the basis for the injury was the insured's intentional act of assault. Because the policy excluded coverage for injury arising out of an assault or battery committed by the insured, the insurer had no duty to defend its insured.

VI

The events and injuries of December 31, 1983, were an "occurrence" as defined in GICOM's policy. However, the bodily injuries suffered by the officers were intended or expected from the standpoint of its insured and are therefore specifically excluded under the policy. The insured intended to act and intended or expected to injure the officers. His conduct falls squarely within the intentional-acts exclusion as written in GICOM's policy. Furthermore, the allegations in the complaint do not arguably fall within the coverage of the insurance policy at issue here. The insured's voluntary intoxication will not provide him with a defense against the operation of the intentional-acts exclusion. GICOM, therefore, owes Smith no duty to defend him under its insurance policy. I would affirm the decision of the Court of Appeals.

LEVIN, J. (*dissenting*). In this action for a declaratory judgment, the Court of Appeals concluded that bodily injuries suffered by police officers Don A. Czopek and Herdis B. Petty in an affray with the insured, Arthur A. Smith, either were not the result of an "occurrence" or were "expected or intended" by Smith, and directed entry of summary disposition for Group Insurance Company of Michigan. I would reverse and remand for trial.

I

Smith, who was then eighteen, walked home at 11:30 P.M. from a New Year's Eve party on December 31, 1983. He was "extremely drunk," having consumed, in two and one-half hours, eight twelve-ounce beers and a pint of peppermint schnapps—less four shots a friend drank. He was walking down the middle of the road, weaving

from side to side, staggering and falling, and inter-
fering with the flow of traffic.

Czopek, patrolling in a squad car, observed
Smith. Czopek stopped his vehicle on the side of
the road and, when Smith walked alongside, told
him, "get off the road. You're going to get hit."[1]
Czopek did not identify himself, and Smith did not
immediately recognize him, as a police officer.
Smith swore at Czopek and kept walking. Czopek
again told Smith to get off the road. Smith again
swore at Czopek, and kept walking. Czopek called
for backup, parked his vehicle, and walked up to
Smith, who began screaming that he had to get
home or his dad would kill him. Smith then began
to run.[2] Czopek recognized that Smith was "ex-
tremely drunk."

Czopek and backup officer Petty followed Smith.
They caught up with him where he had stopped to
rest and was leaning against an automobile. Smith
testified that a man jumped on his back. He had
not identified himself as a police officer.[3] Then
another man came up in front of him. By then,
Smith recognized the men as police officers.

Czopek and Petty attempted to place Smith in a
squad car, but he refused. Smith testified he told

[1] When asked whether he was going to arrest Smith, Czopek re-
sponded:

I don't know. At this point I didn't know. I had no idea. I was
more or less concerned with his safety. I was trying to find out
who he was and where he lived, maybe get him home.

[2] Smith was asked during deposition whether he "took off running,"
and nodded his head affirmatively. He was then asked, "Why did you
do that?" to which he responded, " 'Cause I didn't want to get taken
to jail, so I took off running."

Earlier, Smith had given a statement to an investigator. He was
asked, "Did you know that they were police officers?" and responded
"Not really."

[3] Petty said that he did not identify himself as a police officer and,
as far as he was aware, neither did any of the others.

them that all he wanted to do was go home. He also testified that he knew he was "resisting arrest" by refusing to enter the squad car. Smith further testified that, to prevent the officers from placing him in the vehicle, he braced himself against the car with his feet and hands. Czopek testified that as the officers attempted to handcuff Smith, he fell to the ground and began swinging his arms and kicking his feet so that they could not get near him.

While Smith was on the ground, Petty grabbed Smith's left arm, and Czopek grabbed his right arm. When Smith attempted to get up from the ground, Czopek slipped and fell, and Smith jerked his right arm loose from Czopek's grip. Petty testified that Smith's arm, when he jerked it free from Czopek's grasp, struck Petty in the chest with enough force to break his ribs.[4]

---

[4] On deposition, Smith testified as follows:

*Q.* Do you remember kicking anybody?
*A.* No.
*Q.* Did you hit anybody?
*A.* No.
*Q.* When you were on the ground trying to prevent them from throwing you into the police car, were you kicking on the ground?
*A.* No. I was just putting my feet up against the door and not letting them push me in the car.
I didn't think I did any harm to any of the police officers. The next day, after they told me I did harm to some of the police officers, it was kind of hard to believe that. I didn't have any intent to do that to any of the police officers.
*Q.* But you did intend to resist being arrested, is that right?
*A.* Yes.
*Q.* What happened to you after you got into the police car?
*A.* Then they handcuffed me finally and they threw me in the car and took me down to the Woodhaven Police Station.
*Q.* How long would you estimate it took them to get you in the police car?
*A.* Half an hour, 45 minutes.
*Q.* You did quite a bit of resisting then if it took them a half an hour, 45 minutes, wouldn't you say?

After three more officers arrived, the police were able to handcuff Smith and place him in a squad car. Petty sat in the back seat with Smith, and according to Smith Petty put his finger in Smith's mouth. Smith testified that he believed Petty would "yank the side of [his] face off," and to prevent that he bit Petty's hand.

The officers took between thirty and sixty minutes to secure Smith and place him in the squad car. He was transported to jail. He threatened suicide, and was placed in a padded cell and monitored. Czopek observed Smith try to stuff a mattress in his mouth, and threaten to hang himself.

Czopek was later treated for frostbitten fingers and ears. Petty was treated for broken ribs and given a tetanus shot for the bite.

Smith was charged with two counts of assault and battery, disorderly conduct, and interfering with a police officer. He pleaded guilty to and was convicted of reduced charges of disorderly conduct and assault and battery, was fined $250, and was placed on probation.

Czopek and Petty commenced an action against Smith, seeking damages for personal injury. Smith tendered the defense to Group Insurance, his parents' homeowner insurer.[5] Group Insurance commenced this action for a declaratory judgment, seeking a determination that it was not required to defend.

The circuit judge granted Group's motion for summary disposition regarding the officers' assault and battery claim, but denied summary disposition

---

*A.* Well, not exactly, because at first it was only two cops, and I was trying to talk to them.

[5] Smith resided with his parents and was covered by the policy of insurance.

regarding the negligence claim. The Court of Appeals ordered entry of summary disposition with respect to both claims. This Court remanded for reconsideration in light of *Metropolitan Property & Liability Ins Co v DiCicco,* 432 Mich 656; 443 NW2d 734 (1989), and directed the Court of Appeals to "discuss whether forcibly resisting arrest is an 'accident' within the meaning of the insurance policy's definition of 'occurrence,' regardless of whether the resultant bodily injury was expected or intended from the standpoint of the insured." The Court of Appeals again found that Group Insurance is not required to defend.[6]

II

The majority disposes of this case on the ground that there was no "occurrence" as that term is defined in the policy. The majority finds, on the basis of Smith's admission during deposition that he intended to resist arrest, that "forcibly resisting arrest is not an 'accident' within the meaning of the insurance policy's definition of 'occurrence.' " The majority concludes that because there was no "occurrence" as that term is defined in the policy, coverage for the officers' injuries is barred by the policy.[7]

---

[6] The Court of Appeals said that injuries suffered in the course of an intoxicated person's resisting arrest are not the result of an "accident" within the meaning of "occurrence." Further, the Court of Appeals said that voluntary intoxication that induces violent behavior and results in injury cannot be the basis of a claim that the behavior and resulting harm was accidental.

[7] The policy provides:

COVERAGE E—PERSONAL LIABILITY

This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence. This

The majority further states, as a matter of public policy, that voluntary intoxication cannot be permitted as a defense to the operative effect of the exclusion.

Three issues are raised under the language of the policy in the circumstances of this case:

—Whether the alleged assault is an "occurrence," that is, an "accident, including injurious exposure to conditions, which results . . . in bodily injury."

—If the alleged assault is an occurrence, whether coverage is nonetheless excluded because it resulted in "bodily injury . . . that is either expected or intended from the standpoint of the Insured."

—Whether the insured's voluntary intoxication

---

Company shall have the right and duty, at its own expense, to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, but may make such investigation and settlement of any claim or suit as it deems expedient. This Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of this Company's liability has been exhausted by payment of judgments or settlements.

ADDITIONAL DEFINITIONS

5. "occurrence": means an accident, including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.

\* \* \*

EXCLUSIONS

This policy does not apply:
1. Under Coverage E—Personal Liability and Coverage F—Medical Payments to Others:

\* \* \*

f. to bodily injury or property damage which is either expected or intended from the standpoint of the Insured.

may have so diminished his capacity to expect or intend that the exclusion does not apply.

III

In *DiCicco*, this Court considered an identical homeowner's policy. The lead, albeit dissenting, opinion in *DiCicco* concluded that the "proper construction of a contract requires that we first determine whether coverage exists, and then whether an exclusion precludes coverage. . . . Accordingly, we must determine first whether the . . . incident constituted an 'occurrence.'" *Id.* at 668.[8]

The policy provides coverage for personal injuries caused by an "occurrence," defined as "an accident . . . which results . . . in bodily injury . . . ." This definition does not include the limitation or clarification that the event is to be viewed from the "standpoint of the Insured."[9]

In *DiCicco*, the incident was the stabbing of one

[8] *DiCicco* was consolidated with *Allstate Ins v Freeman*. Five opinions were written in the two consolidated cases. The lead opinion, insofar as it concerned *DiCicco*, was written by Chief Justice RILEY and signed by Justice GRIFFIN. The plurality opinion in *DiCicco*, written by Justice BOYLE, was signed by Justice BRICKLEY, with whom Justices LEVIN, CAVANAGH and ARCHER concurred.

[9] The term "occurrence" is defined as "an accident" that results "in bodily injury or property damage." See n 7 for text.

In deciding whether an assault is an occurrence within the terms of the policy, a crucial question is from whose standpoint the assault is to be viewed. From the standpoint of the insured, an assault is an intentional act. But from the standpoint of the injured party, the assault may well be an unforeseen, unexpected and unanticipated event. See 11 Couch, Insurance, 2d (rev ed), §§ 44:298, 44:300, pp 465-467, 469-470; anno: 72 ALR3d 1090.

Some courts have ruled that whether an event is an accident is to be determined from the standpoint of the injured party. See *Georgia Casualty Co v Alden Mills*, 156 Miss 853; 127 So 555 (1930). Other courts have held that the issue is to be determined from the standpoint of the insured. See *Sontag v Galer*, 279 Mass 309; 181 NE 182 (1932). This split of authority led one commentator to observe that

in response to the conflicting results which may be reached,

student by another during a fight. The lead/dissenting opinion declared that "occurrence" "must be broadly construed," and that "accident," in the definition of "occurrence," was not restricted to "unintentional" actions.[10] The lead/dissenting opinion characterized that the incident in *DiCicco* as "not clear cut enough" for the Court to conclude that there was not an "occurrence."[11] The signers of the plurality opinion agreed.[12]

Consistent with the view of the signers of both the lead/dissenting and the plurality opinions in *DiCicco*, I would similarly construe "occurrence" and conclude, in the instant case, that the incident was "not clear cut enough" to permit this Court to conclude there was not an occurrence.

IV

The policy excludes from coverage "bodily

depending upon whether the assault is viewed from the standpoint of the victim or from that of the assailant, recent years have seen the development of a policy form which covers bodily injuries resulting from an "accident" which was "neither expected nor intended from the standpoint of the insured." [72 ALR3d 1090, 1096.]

Where the policy defines "occurrence" to mean an accident "from the standpoint of the insured," courts will determine from the standpoint of the insured whether an event is an occurrence. See *Briscoe v Travelers Indemnity Co,* 18 Wash App 662; 571 P2d 226 (1977).

[10] The lead opinion summarized events that constitute an "accident":

"[A]n accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." Accordingly, we find that ascertaining the insured's "intent" may determine whether the insured's actions constituted an "accident," but it does not necessarily follow that an insured must act unintentionally for an act to be an "occurrence." [*Id.* at 670.]

[11] *Id.* at 672.

[12] *Id.* at 706.

injury . . . which is either expected or intended from the standpoint of the Insured."

In *DiCicco,* the signers of the plurality opinion ruled that an identical exclusionary clause was unambiguous, and clearly provided that whether an injury was intended or expected was to be determined from the *subjective* standpoint of the insured.[13] The signers of the plurality opinion

---

[13] The plurality opinion in *DiCicco* noted that there are two distinguishable classes of cases under the standard exclusion used in *DiCicco*—identical to the exclusion in the instant case. The first class involves those cases where the insured intended the act, but did not intend the injury. The second class involves those cases where· the insured intended the act, "the result of which injury can only occur." 432 Mich 719.

In the first class of cases—intended act, but unintended injuries—injury is said to be "caused intentionally" within the meaning of the clause so as to preclude coverage "if the insured intended the act *and to cause some kind of bodily injury or damage . . . ." Id.* at 718. Asking whether the insured subjectively "expected or intended" the injuries resulting from his intentional acts, courts have found (see *DiCicco* for case citations) there was coverage where

—the insured intentionally burned his property, but without the intent to cause injury or damage, but in fact caused injury or damage;

—the insureds intentionally pointed their guns, but either the discharge of the gun, or the striking of the injured party was unintentional.

In the second class of cases—intended act of the sort from which injury *must* result—courts presume or infer from the circumstances that the insured intended the resulting injury or damage. Courts have presumed (see *DiCicco* for case citations) that the insured intended his intentional act to result in injury where

—the insured placed a loaded gun to the victim's head and pulled the trigger;

—the insured intended to have sexual intercourse with his minor stepdaughter;

—the insured intended to strike his victim in the face with a closed fist.

In *DiCicco,* the insured, a college student, scuffled with another student. The fight came to an abrupt end. DiCicco returned to his room, and the other student walked down the hallway. DiCicco came out of his room holding an open hunting knife and called the other student offensive names. The other student returned to the hall, saw

ruled that to apply the exclusion on the facts of that case,[14] the Court "need only determine whether [the victim's] injury was either expected or intended from the standpoint of [the insured]."[15]

the knife, and challenged DiCicco to use the knife. DiCicco responded by poking the student in the chest with his empty hand while holding the open knife in his other hand. DiCicco backed the student against the wall. The student reacted, and in the scuffle that followed DiCicco stabbed the student in the stomach.

The trial court found:

"DiCicco denies any intent to use the knife, claiming that he went to get the knife merely to scare away the other persons he considered to be a threat. No one observed him make a gesture of moving the knife as though to stab Gravenmier. The knife was held in his right hand and the poking was done with his left. DiCicco denies knowledge of in fact stabbing. Immediately following the stabbing, DiCicco looked shocked. Gravenmier obviously did not expect DiCicco would use the knife or he would not have engaged in his act of bravado." [432 Mich 664, 710.]

Relying on those findings, the plurality found that "[i]t is obvious that these findings will not require the conclusion that DiCicco expected or intended to injure [the other student]," and that it could not be said that "brandishing a knife always results in injury—that DiCicco's actions preclude coverage as a matter of law." *Id.* at 710, 720. The plurality concluded, therefore, that the exclusionary clause was not relevant, and the insurer was bound to provide a defense to DiCicco in the underlying tort claim.

The lead opinion, in dissent, would have held that "if the court determines that the insured acted intentionally, then the 'expected or intended' language is satisfied by a finding that injury resulted as the 'natural, foreseeable, expected, and anticipated' consequence of those intentional acts." *Id.* at 676. The lead opinion would have found that the facts, as presented in *DiCicco,* presented "the ideal circumstances in which a trial court *should infer the insured's subjective intentions as a matter of law." Id.* at 679. (Emphasis added.) Further, the lead opinion found that DiCicco's claim that he did not expect or intend injury to result from his conduct "flies in the face of all reason, common sense and experience." *Id.* at 682.

[14] See n 13.

[15] In *Allstate v Freeman (DiCicco), supra* at 710, the lead opinion, acknowledged in dissent, "[t]here is precedential authority in this jurisdiction which holds that under [the] exclusion . . . an insured must subjectively intend both his act and the resulting injury in order to avoid its duty to defend and indemnify." *Id.* at 672. See *Morrill v Gallagher,* 370 Mich 578, 583; 122 NW2d 687 (1963), and *Putman v Zeluff,* 372 Mich 553; 127 NW2d 374 (1964). The lead opinion rejected this authority.

V

The majority finds that Smith resisted arrest.[16] I agree that there is evidence that would support a finding by the trier of fact that Smith "resisted arrest."[17] I do not agree, however, that such evidence requires a finding, as a matter of law, that Smith intended to injure Czopek or Petty.

Whether Smith subjectively "intended or expected injury" for the purposes of the exclusion

In *Morrill,* the insured threw a cherry bomb into a co-worker's office intending to frighten him. The co-worker suffered severe hearing damage and a nervous disorder as a result. The homeowner's policy excluded coverage for injuries caused intentionally or at the direction of the insured. This Court held:

> Some emphasis is placed on exclusion (c) on the ground that in the instant case the firecracker was thrown intentionally. Unquestionably such was the case, but it will be noted that under the language of the excluding clause the *injury* must be caused "intentionally." There is nothing in this case to justify a conclusion that [the insured] intended to cause any physical harm to plaintiff. [370 Mich 588.]

In *Putman v Zeluff, supra* at 555, the insured's son shot a dog while on an overnight camping trip. The barking dog, a valuable hunting dog, was rushing toward the campfire. The son shot in the dog's direction, and hit the dog. He intended to shoot, and intended to shoot in the dog's direction. The insured was covered by a homeowner's policy containing an exclusion for " 'injur[ies] . . . caused intentionally by . . . the insured.' " This Court, citing *Morrill,* held that it was a question of fact whether the son—when he shot in the direction of the dog—intended to destroy it. This Court affirmed the trial court's finding that he did not so intend.

16 The majority states:

> In his deposition, Mr. Smith admitted that he intended to prevent the arrest. His actions, biting and swinging his arms and legs, were intended to make it impossible for the officers to easily get him into the squad car and on his way to the police station. Because of Arthur Smith's admission in his deposition, we are unwilling to conclude that his resisting arrest, which resulted in injuries to the policemen, was an "accident." [*Ante,* p 598.]

17 Smith's statement that he resisted arrest, a legal conclusion by a layman, is not judicially binding, and may not even be relevant or material except as a layman's description of his conduct.

depends, under the analysis of the plurality opin-
ion in *DiCicco*,[18] on whether his actions are seen as
involving an intentional act with unintended re-
sults, or as an intended act from which injury
must result.

I conclude, in light of the cases cited by the
plurality in *DiCicco* as illustrative of these two
kinds of cases,[19] and in light of the holding in
*DiCicco* where the insured walked back into a fight
"brandishing" an open weapon, that on the record
so far made this Court could not appropriately find
that Smith intended an act "the result of which
injury can only occur" and therefore presume that
he intended the injury.

VI

Courts in other jurisdictions construing this
clause in the context of bodily injuries caused by
an insured's assault have held that injuries were
"expected or intended from the standpoint of the
insured"[20] where the insured intentionally struck

---

[18] See n 13.

[19] *Id.*

[20] *Holman v Alabama Farm Bureau Mut Casualty Ins Co,* 476 So 2d
107 (Ala, 1985), where the insured, engaging in armed robbery, forced
the victim's car off the road, repeatedly hit the victim, and set fire to
his car; *Clark v Allstate Ins Co,* 22 Ariz App 601; 529 P2d 1195 (1975),
where the insured intentionally struck the victim in the face; *Stein-
metz v Nat'l American Ins Co,* 121 Ariz 268; 589 P2d 911 (1978),
where the insured punched the victim in the face; *Abbott v Western
Nat'l Indemnity Co,* 165 Cal App 2d 302; 331 P2d 997 (1958), where
the insured brutally beat and kicked the victim even after he lay
helpless on the ground; *Hartford Fire Ins Co v Spreen,* 343 So 2d 649
(Fla App, 1977), where the insured walked over to the victim, swung
at him, and struck him in the face; *Maxson v Farmers Ins of Idaho,
Inc,* 107 Idaho 1043; 695 P2d 428 (1985), where the insured punched
the victim in the face; *Mid America Fire & Marine Ins Co v Smith,*
109 Ill App 3d 1121; 441 NE2d 949 (1982), where the insured kicked
the victim in the head; *Home Ins Co v Neilsen,* 165 Ind App 445; 332
NE2d 240 (1975), where the insured struck the victim in the face with
a fist; *Lawrence v Moore,* 362 So 2d 803 (La App, 1978), lv gtd 365 So
2d 230 (La, 1978), dis 368 So 2d 121 (La, 1979), where the insured

or punched the victim. These cases illustrate the second category of cases described by the plurality in *DiCicco,* where the insured's actions were such that it might be said, "the result of which injury can only occur."

Where, however, the circumstances are such that, although the insured intended the assault, there is a factual question whether the insured intended the resulting injury, courts have concluded that the question whether the injuries were "expected or intended from the standpoint of the insured" must be resolved by the trier of fact.[21]

punched the victim twice in the face; *Smith v Senst,* 313 NW2d 202 (Minn, 1981), the insured struck the victim in the face, fracturing his jaw; *Mutual Service Casualty Ins Co v McGehee,* 219 Mont 304; 711 P2d 826 (1985), where the insured deliberately punched the victim in the face; *Jones v Norval,* 203 Neb 549; 279 NW2d 388 (1979), where the insured intentionally hit the victim in the face with his fist and rendered him unconscious; *Vittum v New Hampshire Ins Co,* 117 NH 1; 369 A2d 184 (1977), where the insured punched the victim and clubbed him with a two-by-four; *New York Casualty Ins Co v Ward,* 139 AD2d 922; 527 NYS2d 913 (1988), where the insured punched the victim; *Wear v Farmers Ins Co of Washington,* 49 Wash App 655; 745 P2d 526 (1987), where the insured shoved the victim, then hit him with his fists and knocked him out; *Pendergraft v Commercial Standard Fire & Marine Co,* 342 F2d 427 (CA 10, 1965), where the insured came up behind the victim, spun him around, and punched him.

[21] See *Morrill v Gallagher,* n 15 *supra; Quincy Mut Fire Ins Co v Abernathy,* 393 Mass 81; 469 NE2d 797 (1984) (a factual question with regard to the subjective state of mind was presented where the defendant admitted that he intentionally threw a rock at a moving car, but denied that he intentionally sought to injure anyone; summary judgment in favor of the insurer was reversed); *Farmers Ins Exchange v Sipple,* 255 NW2d 373 (Minn, 1977), where the insured exchanged heated words with the victim, and then struck him with his fist, injuring him, the Minnesota Supreme Court held that the trial court correctly submitted the issue of intent to injure to the jury because assault and battery was not within the exclusion unless a reason for the act is to injure, or the character of the act is such that intent to injure can be inferred; *Hartford Fire Ins Co v Blakeney,* 340 So 2d 754 (Ala, 1976), where the insured pushed a house guest out a doorway, and he fell backward and sustained serious brain injuries, the court held that it was a question for the jury whether the insured expected or intended injury to result from this intentional act; *Rambin v Wood,* 355 So 2d 561 (La App, 1978), where the insured came up behind the victim who was riding a small tractor and pushed or struck him from the rear, the victim's leg was injured when he fell off

Smith testified during deposition that he did not intend to injure Czopek or Petty. He said that he did not kick or punch the officers, but was using his hands and feet alternately to brace himself to prevent the officers from pushing him into the squad car, or, when he was on the ground, to keep them from handcuffing him, and to keep them away from him. He said he was unaware of the subfreezing temperatures.

Czopek and Petty both testified during deposition that Smith did not kick or punch them, although Smith swung his arms and kicked his legs in an effort to prevent them from approaching him.

This Court cannot appropriately decide as a matter of law that Smith acted with the intention of injuring Czopek or Petty or that his actions were such that the result must have been injury to them.

## VII

The majority further concludes, as a matter of public policy, that voluntary intoxication cannot provide a factual basis for denying the operative effect of the exclusionary clause.[22]

The majority relies on *Allstate Ins Co v Sherrill,* 566 F Supp 1286 (ED Mich, 1983).[23] I have found decisions in two other states that also have con-

the tractor, affirming the trial court's ruling that the act was intentional, but that the injury was not; *Home Indemnity Co v Politte,* 602 SW2d 943 (Mo App, 1980).

[22] The majority opines "[f]urther, to allow voluntary intoxication as a defense in a civil action is also unjust. . . . To allow such a defense would be to create the ability to act unwisely without the requisite financial responsibility." *Ante,* p 601.

This analysis ignores that insurance coverage is in general a matter of contract, not public policy, while criminal responsibility is a matter of legislative and, therefore, public policy.

[23] *Ante,* p 599.

cluded that voluntary intoxication "was of no consequence" and may not preclude, in a particular situation, a finding that the insured did not expect or intend injury.[24]

The majority of courts in other jurisdictions, however, have held that voluntary intoxication may provide a factual predicate for a determination that injuries were not expected or intended.

In the specific factual situation here presented, where the insured was voluntarily intoxicated at the time of the alleged assault, most courts have held that intoxication may destroy, for purposes of the exclusion, the capacity to form the requisite intent.[25]

Thus, in *Burd v Sussex Mut Ins Co,* 56 NJ 383, 386; 267 A2d 7 (1970), the Supreme Court of New Jersey held that where a drunken insured was convicted of "atrocious assault and battery," coverage for the resulting civil claim was not necessarily barred by the exclusion.[26] The court said that

[24] See *Hanover Ins Co v Newcomer,* 585 SW2d 285, 289 (Mo App, 1979); *Travelers Ins Co v Cole,* 631 SW2d 661, 664 (Mo App, 1982); *American Family Mut Ins Co v Peterson,* 405 NW2d 418 (Minn, 1987); *Economy Fire & Casualty Ins Co v Meyer,* 427 NW2d 742 (Minn App, 1988).

See also *Allstate Ins Co v Hampton,* 173 Mich App 65; 433 NW2d 334 (1988), cited by the majority.

[25] See *State Farm Fire & Casualty Co v Morgan,* 185 Ga App 377; 364 SE2d 62 (1987), aff'd 258 Ga 276; 368 SE2d 509 (1988); *NN v Moraine Mut Ins Co,* 153 Wis 2d 84; 450 NW2d 445 (1990); *Parkinson v Farmers Ins Co,* 122 Ariz 343; 594 P2d 1039 (1979); *Transamerica Ins Co v Thrift-Mart, Inc,* 159 Ga App 874; 285 SE2d 566 (1981); *Badger Mut Ins Co v Murry,* 54 Ill App 3d 459; 370 NE2d 295 (1977); *Burd v Sussex Mut Ins Co,* 56 NJ 383; 267 A2d 7 (1970); *Garden State Fire & Casualty Co v Keefe,* 172 NJ Super 53; 410 A2d 718 (1980); *Kenna v Griffin,* 4 Wash App 2d 363; 481 P2d 450 (1971); *U S F & G Ins Co v Brannan,* 22 Wash App 2d 341; 589 P2d 817 (1979); *Nettles v Evans,* 303 So 2d 306 (La App, 1974); *Perilloux v Nelson,* 378 So 2d 551 (1979).

[26] The policy in *Burd* provided that the company would pay for all bodily injuries for which the insured was legally liable, but under a special exclusion stated that coverage did not apply to " 'bodily injury . . . caused intentionally by . . . the Insured.' " *Id.* at 387.

the insured's conviction for assault and battery did not collaterally estop him from asserting that his voluntary intoxication was such that he could not form the intent to injure.[27]

The court said it was the insurer's burden to establish that the insured, despite his intoxication, formed the requisite intent to injure the victim.

### VIII

I conclude that the factual situation in this case is not clear enough to allow this Court to say that there was no occurrence, as that term is defined in the policy. I conclude further that Smith's actions, even if characterized as resisting arrest, do not require a determination as a matter of law that he intended thereby to injure Czopek and Petty. In light of Smith's testimony that he did not intend to injure Czopek or Petty, it is a question of fact whether, assessing the extent to which he was intoxicated, he had formed, or was capable of forming, the requisite intent to injure Czopek or Petty.

I would reverse the decision of the Court of Appeals and remand for trial.

---

[27] This contrasts with the court's reasoning in *Allstate Ins Co v Sherrill, supra,* relied on by the majority. There the court held that because Michigan does not permit voluntary intoxication to be interposed as a defense in a criminal case, this Court would not permit the exclusion to be avoided on the basis of voluntary intoxication. The court said that an insured should not be permitted to avail himself of insurance to escape his financial responsibilities.