*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PETE'S AUTO AND TRUCK PARTS, INC., and
R&S INITIATIVES, LLC,

UNPUBLISHED
June 9, 2022

Plaintiffs-Appellants/Cross-Appellees,

v

No. 355841
Ottawa Circuit Court
LC No. 18-005437-ND

GREG HIBBITTS TRANSPORT COMPANY,
STEWART TRK, LLC, GREG HIBBITTS, BMB
LEASING, LLC, and BELINE
TRANSPORTATION SERVICES, LLC,

Defendants-Appellees,

and

FREMONT INSURANCE COMPANY,

Defendant-Appellee/Cross-Appellant.

Before: BORRELLO, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

This case arose from a fire in the engine of a parked semi-truck, which resulted in damage to a nearby building and the building's contents. Plaintiffs—the owner and the tenant of the building—sought to recover damages from several defendants under various theories, including negligence; trespass; property protection insurance benefits under the no-fault act, MCL 500.3101 *et seq.*; breach of contract; and unjust enrichment. Relevant to the issues on appeal, the trial court granted summary disposition on plaintiffs' tort claims to defendants Greg Hibbitts Transport Company (GHTC); Stewart TRK, LLC; BMB Leasing, LLC; Beline Transportation Services (BTS), LLC; and Greg Hibbitts (collectively, the Hibbitts defendants) on the basis that the no-fault act applied and precluded plaintiffs' tort claims against the Hibbitts defendants. The trial court also granted summary disposition to the remaining defendant, Fremont Insurance Company, concluding that plaintiffs' claims for no-fault benefits were time-barred by MCL 500.3145(5) and that Fremont was entitled to summary disposition on plaintiffs' claims for breach of contract and unjust enrichment under MCR 2.116(C)(8) and (C)(10). Plaintiffs appeal as of right, and Fremont has filed a cross-appeal. For the reasons explained in this opinion, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

On October 13, 2017, the engine of a parked semi-tractor truck caught fire, and the resulting fire damaged an adjacent building located at 2460 Wilshire Drive in Jenison. The building was owned by plaintiff R&S Initiatives, LLC, which in turn rented the building to plaintiff Pete's Auto and Truck Parts, Inc., which used the building for its business. The fire damaged both the building and Pete Auto's inventory inside.

According to the certificate of title for the truck, GHTC was the registered owner of the truck that caught fire, and Hibbitts was the registered agent and sole shareholder in GHTC. However, GHTC ceased operations in 2010, and GHTC filed a certificate of dissolution on June 28, 2011. At the time of the fire, GHTC did not have an insurance policy in its name for the truck. Instead, the truck was listed on a commercial auto policy, issued by Fremont, that identified the named insured as "Stewart Trucking, LLC," doing business as "Beline Trans LLC."

Although the Fremont policy refers to "Stewart Trucking, LLC," the defendant in this case—and the entity associated with Hibbitts—is actually "Stewart TRK, LLC." Hibbitts's wife was the "legal owner" of Stewart TRK, but she had nothing to do with running Stewart TRK. In practice, Hibbitts ran Stewart TRK as well as several interrelated corporate entities, all of which were involved in his trucking business. In total, between his various entities, Hibbitts utilized approximately 25 to 27 trucks, all of which bear the "Beline" logo, though the trucks are titled and operated by different entities. According to Hibbitts, the various entities were created to carry on his trucking business after GHTC declared bankruptcy. The other entities involved with Hibbitts's trucking business include Beline Trans, LLC, in which Hibbitts is the sole managing member. Hibbitts also uses another entity—BTS—to manage and oversee Stewart TRK and Beline Trans, LLC. Hibbitts is the registered agent and manager of BTS, but he identified his son as the "legal owner" of BTS. Like his wife, Hibbitts's son had no involvement in running the businesses. The final entity at issue, BMB Leasing, owns the real property used for Hibbitts's trucking activities, specifically a property neighboring the building that caught fire.

According to Hibbitts, he and his various business organizations were involved in the business of transporting products, such as milk, sand, gravel, aggregate, and auto parts. Hibbitts denied being in the business of repairing, servicing, or otherwise maintaining motor vehicles. Hibbitts did, however, employ mechanics to work on his trucks. As confirmed by one of the mechanics, Joseph Wilson, the mechanics employed by Hibbitts *only* performed work on Hibbitts's trucks. Hibbitts also denied using his trucks to haul hazardous materials. BTS, in particular, hauled nonhazardous trash for Waste Management. The truck that caught fire was being used by BTS for this purpose on the day of the fire.

More specifically, on the day of the fire, Albert Dykstra, an employee of BTS, used the truck to haul trash for Waste Management. Then, at approximately 3:30 p.m., Dykstra parked the truck on R&S's property, next to R&S's building. Soon after Dykstra parked, the truck caught fire. The truck was unoccupied when the fire began.

Shortly after the fire, plaintiffs' attorney—Donovan Visser—spoke with Hibbitts, who referred Visser to Fremont as his insurance carrier. Visser contacted Fremont and received confirmation that there was an insurance policy to cover plaintiffs' damages, with a limit of

$1,000,000.[1]  In November 2017, a fire investigation undertaken by DeKraker Investigations, LLC, concluded that the fire was an accidental fire resulting from "an electrical failure" within the truck's engine compartment.  Following receipt of the DeKraker report, Visser contacted the Fremont claims adjuster assigned to plaintiffs' claims—Nichole Chuchvara.  According to Visser, Chuchvara told him that "liability would not be an issue" because the report had concluded that the truck was the cause of the fire, and Chuchvara told Visser that Fremont would provide coverage, provided that sufficient documentation was submitted to support plaintiffs' losses.

In May 2018, Visser sent two demand letters to Chuchvara, seeking payment of plaintiffs' losses from Fremont.  In July 2018, Fremont informed Visser that Steve Bowne of Burns and Bowne Adjusting had been hired to adjust plaintiffs' claims, and Visser provided Bowne with the demand letters detailing plaintiffs' losses.  On August 14, 2018, Bowne informed Visser—via voice mail—that Fremont would not be making payment and that Bowne's estimate was not even close to plaintiffs' demand.  Bowne told Visser that plaintiffs "might as well file suit."

By this time, pursuant to complaints filed in July 2018, plaintiffs had, in fact, filed suit against GHTC and Stewart TRK.  Even after Bowne told them that Fremont would not be paying the claim, plaintiffs did not, however, initially seek to add Fremont to the case.  Visser maintained that he believed that Fremont was processing the claim as a general liability or fire claim.  He had also reviewed the no-fault act and concluded that it did not apply to this case.  Consequently, plaintiffs did not initially sue Fremont under the no-fault act, and as to GHTC and Stewart TRK, plaintiffs' initial claims consisted of negligence and trespass claims.

Several motions for summary disposition were filed during the course of the case.  The first summary disposition motion was filed by GHTC and Stewart TRK, at which time they asserted that plaintiffs' torts claims could not proceed because they related to property damage arising from the use of a motor vehicle and were subject to the no-fault act, which abolished tort liability and instead required plaintiffs to seek recovery from Fremont.  Plaintiffs responded that the no-fault act did not apply because their claim involved a fire resulting from negligence in failing to properly maintain the semi-trailer, which plaintiffs characterized as a casualty claim, properly brought against GHTC and Stewart TRK.  Additionally, plaintiffs argued that, even if the no-fault act applied to a truck fire, it was inapplicable because GHTC—as the truck's owner—failed to maintain the required insurance.  Plaintiffs also argued that the no-fault act did not cover the loss because the Hibbitts entities were involved in the business of auto repairs or hauling hazardous materials.  Plaintiffs also asked for leave to amend their complaint to add Fremont as an alternate defendant.

The trial court denied the motion for summary disposition, reasoning that fact questions remained regarding whether the Hibbitts entities were involved in the auto-repair business.  Although ultimately denying GHTC and Stewart TRK's summary disposition motion, the trial court nevertheless agreed with many of their arguments.  That is, the trial court concluded that the damage caused by the truck fire was generally within the purview of the no-fault act.  And notably,

---

[1] In addition to seeking benefits from Fremont, Pete's Auto also submitted a claim to its own insurer, Nationwide Insurance.  Nationwide paid Pete's Auto $160,538.22.  Fremont later subrogated Nationwide's claim and reimbursed Nationwide for the payments made to Pete's Auto.

relying on the then-recent decision in *Dye*,[2] the trial court also rejected plaintiffs' argument that the no-fault act did not apply because GHTC—as the owner—failed to personally maintain insurance on the truck. Plaintiffs later moved for reconsideration, arguing that *Dye* should not apply to this case for various reasons, but the trial court denied this motion.

In the meantime, the trial court granted plaintiffs' request to amend their complaint. In an amended complaint, dated October 2019, plaintiffs named Fremont as a defendant and, as to Fremont, included claims for no-fault benefits, breach of contract, and unjust enrichment. The amended complaint also identified Hibbitts, BMB Leasing, and BTS as additional defendants, alleging, in relevant part, that these defendants could also be held liable for negligence and trespass.

In various subsequent motions, the Hibbitts defendants and Fremont sought summary disposition. In sum, Fremont contended that the period of limitations had expired on plaintiffs' no-fault claim under MCL 500.3145(5), that plaintiffs failed to state a claim for unjust enrichment, and that plaintiffs could not pursue a breach-of-contract claim because they were not parties to the insurance contract nor were they intended third-party beneficiaries. The Hibbitts defendants, in comparison, again asserted that the no-fault act applied and that plaintiffs could not pursue tort claims against them. Plaintiffs opposed the various motions for summary disposition and filed their own motion for partial summary disposition as to Fremont, contending that equitable estoppel precluded Fremont from raising the statute of limitations as a bar to plaintiffs' claims. In addition, plaintiffs moved to strike the Hibbitts defendants' affirmative defenses filed on September 19, 2018, in response to plaintiffs' initial complaint.[3]

The trial court dismissed plaintiffs' claim for breach of contract against Fremont under MCR 2.116(C)(8). Later, following the close of discovery, the trial court entered a 33-page written opinion and order (1) granting summary disposition to defendants on all then-remaining claims, (2) denying plaintiffs' motion for partial summary disposition, and (3) denying plaintiffs' motion to strike the Hibbitts defendants' affirmative defenses. Briefly stated, in granting summary disposition to the Hibbitts defendants, the trial court concluded that no genuine issue of material fact remained and that the Hibbitts defendants were not in the auto-repair business. The trial court again concluded that *Dye* applied retroactively to this case. Additionally, having concluded that the case fell within the no-fault act and that insurance had been maintained for the truck, the trial court determined that plaintiffs could not pursue tort claims against the Hibbitts defendants because the no-fault act abolished tort liability in these circumstances. As to Fremont, the trial court concluded that plaintiffs' claims for no-fault benefits were time-barred by MCL 500.3145(5), rejecting plaintiffs' arguments that their claim should be considered timely on the basis of the relation-back doctrine, fraudulent concealment, or equitable estoppel. Finally, the trial court granted summary disposition to Fremont on plaintiffs' unjust-enrichment claim under MCR 2.116(C)(8) and (C)(10).

---

[2] *Dye v Esurance Prop & Cas Ins Co*, 504 Mich 167; 934 NW2d 674 (2019).

[3] By this time, in response to plaintiffs' amended complaint in October 2019, the Hibbitts defendants had filed amended affirmative defenses.

## II.  THE HIBBITTS DEFENDANTS

### A.  STANDARDS OF REVIEW

We review de novo a trial court's decision on a summary disposition motion.  *Henry Ford Health Sys v Everest Nat'l Ins Co*, 326 Mich App 398, 402; 927 NW2d 717 (2018).  "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law."  *Id.* (quotation marks and citation omitted).  Issues involving statutory interpretation or the interpretation of a contract are also reviewed de novo.  *Id.*  Whether a judicial decision applies retroactively poses a question of law, which is likewise reviewed de novo.  *Farley v Advanced Cardiovascular Health Specialists PC*, 266 Mich App 566, 570-571; 703 NW2d 115 (2005).  Decisions relating to the enforcement of scheduling orders and whether to consider untimely documents are matters within the trial court's discretion.  *Flanagin v Kalkaska Co Rd Comm*, 319 Mich App 633, 640; 904 NW2d 427 (2017).  Finally, we review a trial court's decision whether to strike a pleading for an abuse of discretion.  *Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 469; 666 NW2d 271 (2003).  "A trial court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes."  *Andreson v Progressive Marathon Ins Co*, 322 Mich App 76, 83; 910 NW2d 691 (2017).

### B.  PROPERTY PROTECTION BENEFITS UNDER THE NO-FAULT ACT

"The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses."  *Shavers v Kelley*, 402 Mich 554, 578-579; 267 NW2d 72 (1978).  The economic losses covered by the no-fault act include certain property damages.  *Id.* at 579-580.  That is, pursuant to MCL 500.3101(1), "the owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under personal protection insurance and property protection insurance as required under this chapter, and residual liability insurance."

Provided that the security required by MCL 500.3101(1) is in effect, "[t]ort liability for property damage arising from the use of a motor vehicle in this state has been abolished, unless the damage is intentionally caused."  *Universal Underwriters Ins Co v Kneeland*, 235 Mich App 646, 654; 599 NW2d 519 (1999) (quotation marks and citation omitted), aff'd 464 Mich 491 (2001).  More fully, in relevant part, MCL 500.3135(3) abolished tort liability in the context of property damages as follows:

> Notwithstanding any other provision of law, tort liability arising from the ownership, maintenance, or use within this state of a motor vehicle with respect to which the security required by section 3101(1) was in effect is abolished except as to:
>
> (a) Intentionally caused harm to persons or property.  Even though a person knows that harm to persons or property is substantially certain to be caused by his or her act or omission, the person does not cause or suffer that harm intentionally if he or she acts or refrains from acting for the purpose of averting injury to any person, including himself or herself, or for the purpose of averting damage to tangible property.

With this abolition of tort liability, a plaintiff seeking to recover economic losses related to property loss must generally look to the no-fault insurer, and not the insured, for payment of damages. *Matti Awdish, Inc v Williams*, 117 Mich App 270, 275; 323 NW2d 666 (1982).

The property protection benefits payable by an insurer under the no-fault act—and exceptions to an insurer's obligation to provide coverage—are set forth in MCL 500.3121, which, in part, states:

> (1) Under property protection insurance an insurer is liable to pay benefits for accidental damage to tangible property arising out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle subject to the provisions of this section and sections 3123, 3125, and 3127. However, accidental damage to tangible property does not include accidental damage to tangible property, other than the insured motor vehicle, that occurs within the course of a business of repairing, servicing, or otherwise maintaining motor vehicles.
>
> (2) Property protection insurance benefits are due under the conditions stated in this chapter without regard to fault.
>
> (3) Damage to tangible property consists of physical injury to or destruction of the property and loss of use of the property so injured or destroyed. [MCL 500.3121.]

### 1. OWNER'S OBLIGATION TO MAINTAIN INSURANCE

Plaintiffs' arguments related to the Hibbitts defendants primarily concern the application of *Dye* and whether the Hibbitts defendants maintained the no-fault security required by MCL 500.3101(1). That is, plaintiffs contend that the no-fault act does not apply and that tort liability is not abolished under MCL 500.3135(3) because GHTC—as the registered owner of the truck—failed to maintain security as required by MCL 500.3101(1).

To provide context and address all plaintiffs' arguments related to an owner's obligation to maintain insurance under the no-fault act, some background on the caselaw related to this issue is warranted. In this regard, this Court's prior caselaw on this topic—namely, *Barnes v Farmers Ins Exch*, 308 Mich App 1, 8; 862 NW2d 681 (2014), overruled by *Dye*, 504 Mich at 173-174, and *Iqbal v Bristol West Ins Group*, 278 Mich App 31, 39; 748 NW2d 574 (2008)—was aptly summarized by the *Dye* Court as follows:

> In *Iqbal v Bristol West Ins Group*, the Court of Appeals first addressed in a published decision whether every owner of a vehicle is required to maintain insurance on the vehicle under the no-fault act . . . . In that case, the plaintiff did not have title to any vehicle, but he frequently used his brother's BMW. The plaintiff was injured while driving the BMW and requested no-fault benefits. In his answers to interrogatories, the plaintiff indicated that the BMW " 'belonged to my brother but I had primary possession.' " The insurer claimed that the plaintiff should also be considered an owner of the car and that as an owner, the plaintiff must have obtained the insurance policy to obtain PIP benefits. The panel rejected this argument, stating:

Viewing the statutory language in the context of the given facts, the statute would preclude plaintiff from being entitled to PIP benefits if plaintiff "was the owner . . . of [the BMW] . . . involved in the accident with respect to which the security required by section 3101 . . . was not in effect." As part of the process of construing MCL 500.3113(b), we shall make the assumption that plaintiff was an "owner" of the BMW, as that term is defined in MCL 500.3101(2)(g)(*i*). Next, the phrase "with respect to which the security required by section 3101 . . . was not in effect," § 3113(b), when read in proper grammatical context, defines or modifies the preceding reference to the motor vehicle involved in the accident, here the BMW, and not the person standing in the shoes of an owner or registrant. The statutory language links the required security or insurance solely to the vehicle. Thus, the question becomes whether the BMW, and not plaintiff, had the coverage or security required by MCL 500.3101. As indicated above, the coverage mandated by MCL 500.3101(1) consists of "personal protection insurance, property protection insurance, and residual liability insurance." While plaintiff did not obtain this coverage, there is no dispute that the BMW had the coverage, and that is the only requirement under MCL 500.3113(b), making it irrelevant whether it was plaintiff's brother who procured the vehicle's coverage or plaintiff. Stated differently, the security required by MCL 500.3101(1) was in effect for purposes of MCL 500.3113(b) as it related to the BMW.

In sum, *Iqbal* held that the only requirement under MCL 500.3113(b) was that there be no-fault insurance on the vehicle—who purchased the policy was irrelevant . . . . In *Barnes v Farmers Ins Exch*, the Court of Appeals was presented with a very similar question.

\* \* \*

In *Barnes*, after hearing arguments, "the trial court ruled that the no-fault act required at least one of the 'owners' to have insurance. It reasoned that because neither plaintiff nor [her mother] had insurance, plaintiff was barred from seeking benefits under the no-fault act." The trial court granted summary disposition to the insurer.

The plaintiff in *Barnes* appealed, arguing that *Iqbal* required the opposite result. The Court of Appeals stated:

In the present case, plaintiff cites *Iqbal* and argues that the fact that neither she nor [her mother] insured the Cavalier does not matter because Huling did. Plaintiff contends that this is so regardless of whether Huling was an owner of the Cavalier. *Iqbal* should not be read so broadly as to apply to even nonowners. The Court made it clear that it was addressing the problem of whether the statute required "each and every owner" to maintain insurance on a vehicle. The Court opined that to so hold would preclude an owner who obtained insurance from

receiving PIP benefits as long as any other co-owner did not maintain coverage as well.

Thus, *Barnes* distinguished *Iqbal*, stating that "while *Iqbal* held that each and every owner need not obtain insurance, it did not allow for owners to avoid the consequences of MCL 500.3113(b) if no owner obtained the required insurance." In sum, *Barnes* held that only a registrant or owner may procure no-fault insurance for a vehicle. . . . [*Dye*, 504 Mich at 183-186 (citations omitted).]

The *Dye* Court overruled *Barnes* and agreed with *Iqbal*, holding that "an owner or registrant of a motor vehicle is not required to personally purchase no-fault insurance for his or her vehicle in order to avoid the statutory bar to PIP benefits." *Id*. at 172-173. "Rather, MCL 500.3101(1) only requires that the owner or registrant 'maintain' no-fault insurance, and the term 'maintain,' as commonly understood, means to keep in an existing state." *Id*. at 173.

As applied here, under *Dye* GHTC, as the truck's owner could fulfill its obligation to maintain insurance under MCL 500.3101(1) by having another person or entity maintain insurance. Plaintiffs, however, offer a long list of arguments why *Dye* should not apply and why the Fremont policy should not be held to satisfy MCL 500.3101(1) or to result in the abolition of tort liability under MCL 500.3135(3).

## A. RETROACTIVE APPLICATION OF *DYE*

First, we reject plaintiffs assertion that *Dye* should not apply retroactively. "[T]he general rule is that judicial decisions are given full retroactive effect." *Pohutski v Allen Park*, 465 Mich 675, 696; 641 NW2d 219 (2002). To determine whether a decision applies retroactively, the threshold question is "whether the decision clearly established a new principle of law." *Id*. at 696. Under this threshold inquiry, a new principle of law may be established "either by overruling clear past precedent on which the parties have relied or by deciding an issue of first impression where the result would have been unforeseeable to the parties." *Mich Ed Employees Mut Ins Co v Morris*, 460 Mich 180, 190; 596 NW2d 142 (1999). However, a complete prospective application is generally "limited to decisions which overrule clear and uncontradicted case law." *Id*. at 189 (quotation marks and citation omitted). Following consideration of the *Pohutski* threshold question, there are three factors to weigh when determining whether a decision should apply retroactively: "(1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice." *Pohutski*, 465 Mich at 696.

Plaintiffs' retroactivity argument fails because, for purposes of the threshold question in *Pohutski*, *Dye* did not overrule clear past precedent or clearly establish a new principle of law, given that *Barnes* did not accord with the statutory language and that it was not uncontradicted insofar as it conflicted with this Court's earlier decision in *Iqbal*. In other words, rather than announcing a new rule, *Dye* simply "reaffirmed the existing law, which was misinterpreted by the Court of Appeals" in *Barnes*. See *Mich Edu Employees Mut Ins Co*, 460 Mich at 192. That *Dye* was intended to reaffirm the existing law—as stated in the statutory language and recognized in *Iqbal*—is apparent from the discussion of *Barnes* and *Iqbal* in *Dye*¸ where the Court stated:

As previously discussed, the Court of Appeals in *Iqbal* opined that "the phrase 'with respect to which the security required by section 3101 . . . was not in

effect,' § 3113(b), when read in proper grammatical context, defines or modifies the preceding reference to the motor vehicle involved in the accident, here the BMW, and not the person standing in the shoes of an owner or registrant. The statutory language links the required security or insurance solely to the vehicle." Despite acknowledging that *Iqbal* also stated that " 'there is no dispute that the BMW had the coverage, and that is the only requirement under MCL 500.3113(b),' " the *Barnes* panel nonetheless concluded that "*Iqbal* does not protect owners of vehicles if no owner provides the insurance . . . ." In our view, a fair reading of *Iqbal* does not indicate that at least one owner must obtain no-fault insurance. Indeed, *Iqbal* concludes that

> [b]ecause the language in MCL 500.3113(b) precluding recovery of PIP benefits links the security or insurance requirement to the vehicle *only* and not the person, the trial court correctly ruled that plaintiff was entitled to PIP benefits because the vehicle was in fact insured, regardless of whether plaintiff was the "owner" of the vehicle.

Thus, while *Barnes* may be distinguishable from *Iqbal* on its facts, we conclude that those factual distinctions did not place *Barnes* outside the ambit of *Iqbal*'s holding.

In sum, we agree with *Iqbal* that MCL 500.3113(b) refers to the required security or insurance under MCL 500.3101 only as it relates to the vehicle. [*Dye*, 504 Mich at 188-189.]

Given the plain language of the statute and the tension between *Barnes* and *Iqbal*, *Dye* was not unforeseeable and did not announce a new principle of law by overruling clear past precedent. See *Mich Ed Employees Mut Ins Co*, 460 Mich at 192-197. Instead, the *Dye* Court adhered to the plain language of the no-fault act—and reaffirmed the holding in *Iqbal*. Because *Dye* did not clearly establish a new principle of law, it does not satisfy *Pohutski*'s threshold question and should be applied retroactively. See *Pohutski*, 465 Mich at 696. Cf. *WA Foote Mem Hosp v Mich Assigned Claims Plan*, 504 Mich 985; 934 NW2d 44 (2019) (concluding that the Supreme Court's decision in *Covenant*,[4] which overruled decades of apparently erroneous Court of Appeals caselaw, should be given retroactive effect because it did not clearly establish a new principle of law).

## B. *DYE*'S APPLICATION TO PROPERTY PROTECTION INSURANCE

Next, plaintiffs contend that *Dye* should be limited to cases involving PIP benefits and should not be extended to cases involving property protection insurance benefits and the abolition of tort liability for property damage.

As a statutory matter, *Dye* considered the plaintiff's eligibility for PIP benefits in light of MCL 500.3113(b), which precludes PIP benefits for an owner or registrant of a motor vehicle

---

[4] *Covenant Med Ctr, Inc v State Farm Mut Auto Ins Co*, 500 Mich 191; 895 NW2d 490 (2017).

"involved in the accident with respect to which the security required by [MCL 500.3101(1)] was not in effect." *Dye*, 504 Mich at 182. However, although *Dye* involved the PIP disqualifier in MCL 500.3113(b), its primary focus was the language in MCL 500.3101(1) and what is required to "maintain" insurance under this provision. *Id*. at 186 ("our analysis primarily concerns the language of MCL 500.3101(1))." The *Dye* Court's focus on MCL 500.3101(1) is significant because MCL 500.3101(1) expressly sets forth the requirement to maintain both "personal protection insurance *and* property protection insurance." (Emphasis added.) In light of that, there is no statutory basis for concluding that *Dye* should only apply to PIP benefits or that some higher or different standard is required for an owner to "maintain" property protection insurance.

Further, like the PIP disqualifier in MCL 500.3113(b), the abolition of tort liability in MCL 500.3135(3) also depends on whether "the security required by [MCL 500.3101(1)] was in effect." Given that the PIP disqualifier in MCL 500.3113(b) and the abolition of tort liability both turn on whether the security required by MCL 500.3101(1) was in effect, there is again no basis in the no-fault act for imposing different requirements for maintaining insurance for purposes of PIP benefits as compared to determining whether tort liability—including tort liability for property damages—has been abolished under MCL 500.3135(3).

Accordingly, we decline to limit *Dye*'s application to cases involving PIP benefits, and we conclude that it applies to a determination of whether GHTC maintained no-fault insurance as required by MCL 500.3101(1). [5]

C. INSURANCE MAINTAINED BY CORPORATE ENTITIES

In arguing that the security required by MCL 500.3101(1) was not in effect, plaintiffs also assert that GHTC lacked the ability to maintain insurance—either personally or through someone else—because GHTC is a defunct corporation. Plaintiffs argue that maintaining insurance is not among the activities a corporation may engage in while winding up and that, in any event, GHTC should have finished the winding-up process long ago. In a somewhat different vein, though also related to whether insurance was maintained by one of Hibbitts's corporate entities, plaintiffs dispute whether any of the entities obtained insurance for the truck when the named insured on the Fremont policy was "Stewart Trucking, LLC," rather than Stewart TRK.

First, with regard to the activities that a dissolved corporation may engage in, this Court has previously explained:

> Chapter 8 of the Business Corporation Act (BCA), 450.1801 *et seq*., governs the dissolution and winding up of Michigan corporations. Of particular relevance in the present case, the BCA provides that "a dissolved corporation, its officers, directors and shareholders shall continue to function in the same manner

---

[5] Underlying plaintiffs' attempts to limit *Dye* to PIP benefits is a policy argument—namely, that the *Dye* Court sought to meet the legislative goal of ensuring medical coverage for an injured party and that these same policy concerns do not exist in the realm of property protection. *Dye*, 504 Mich at 192 n 66. However, "the policy behind a statute cannot prevail over what the text actually says." *Id. Dye* sought to apply the statutory language as written; it did not purport to judicially legislate on the basis of some unspecified policy concerns.

as if dissolution had not occurred," MCL 450.1834, and that a dissolved corporation may continue to "sue and be sued in its corporate name . . . in the same manner as if dissolution had not occurred," MCL 450.1834(e) . . . However, the BCA expressly makes MCL 450.1834 "[s]ubject to section 833," which provides that although "a dissolved corporation shall continue its corporate existence," it "shall not carry on business except for the purpose of winding up its affairs . . . ." MCL 450.1833. Reading MCL 450.1833 and 450.1834 together as we must . . . it is clear that a dissolved Michigan corporation may continue to exist beyond its date of dissolution only until it[] has concluded "winding up its affairs . . ." MCL 450.1833. [*Flint Cold Storage v Dep't of Treasury*, 285 Mich App 483, 495-496; 776 NW2d 387 (2009).]

By statute, during the winding-up process, title to the corporation's assets "remains in the corporation until transferred by it in the corporate name." MCL 450.1834(b), and the corporation may collect assets as well as sell or otherwise transfer assets. MCL 450.1833(a) and (b). More generally, the corporation may perform "all other acts incident to liquidation of its business and affairs." MCL 450.1833(d).

Notably, part of a dissolved corporation's power to hold assets necessarily includes the authority to take steps to preserve its assets while winding up. See *Kay Furniture Co v Rovin*, 312 Mich 290, 294; 20 NW2d 194 (1945) (concluding that a corporation's renewal of a lease was not improper continuation of business affairs but simply "perpetuat[ing] and thereby conserv[ing] a potential asset"); 16A Fletcher Cyclopedia, Corporations § 8134 ("A dissolved corporation may take any necessary action to preserve its assets during the winding up process."). In this context, the corporation may, for example, pay obligations associated with holding property, such as property taxes. See *Kay Furniture Co*, 312 Mich at 295. And, to preserve and protect assets, a corporation may also "contract to insure its property against fire and other hazards . . . ." 16A Fletcher Cyclopedia, Corporations § 8134. In short, contrary to plaintiffs' arguments, the activities that a corporation may engage in while winding-up include actions to preserve and protect assets, such as maintaining insurance.

Even if maintaining insurance can be construed as part of winding up a corporation, plaintiffs note that winding-up must be completed in a "reasonable time," and GHTC failed to complete its activities in a reasonable time. There are several flaws in plaintiffs' argument. First, plaintiffs fail to explain the significance of GHTC's protracted winding up; that is, plaintiffs fail to cite any authority regarding the effects of failing to complete the winding-up process in a reasonable time. Plaintiffs certainly offer no authority to support that failing to complete the winding-up process in a reasonable time would invalidate this insurance policy. Second, in addressing the effect of GHTC's dissolved status in the context of whether GHTC or someone else could "maintain" insurance, the trial court specifically relied on *Flint Cold Storage* to conclude that, following dissolution, GHTC's assets would have passed to its sole shareholder—namely, Hibbitts—and that Hibbitts, as an individual, would then be seen to have maintained insurance as the truck's owner. On appeal, plaintiffs do not address the trial court's conclusion that GHTC's assets—including the truck—would have passed to Hibbitts upon dissolution. "When an appellant fails to address the basis of a trial court's decision, this Court need not even consider granting relief." *Seifeddine v Jaber*, 327 Mich App 514, 522; 934 NW2d 64 (2019). For these reasons alone, plaintiffs cannot prevail on their "defunct corporation" argument.

-11-

More substantively, in *Flint Cold Storage*, 285 Mich App at 497, this Court recognized that the BCA does not contain an express time limit for winding up corporate affairs, and in the absence of an express time period, "a corporation must finish liquidating its business and complete the winding up process within a reasonable time." What constitutes a reasonable time to wind up affairs generally presents a question of law for the court. *Id*. at 498. "[O]nce a dissolved corporation has finished winding up its affairs, its existence is terminated and it ceases to exist for all purposes." *Id*.

GHTC filed its certificate of dissolution on June 28, 2011. The fire occurred in October 2017, at which time the truck was still titled in GHTC's name. Absent different facts, more than six years to wind up GHTC's business affairs does not appear reasonable. Although there is little caselaw elaborating on what constitutes a "reasonable time," there is also nothing to suggest that GHTC's affairs were particular complex or that six years was required to complete the winding-up process.

However, even assuming that GHTC should have completed winding up its affairs in a timelier manner and that GHTC should be considered terminated and without existence for all purposes, the trial court correctly recognized that "a dissolved corporation's remaining assets pass to its shareholders as beneficial owners once liquidation and winding up is complete and all creditors have been satisfied." *Id*. at 501. In other words, following dissolution, GHTC's assets would have passed to Hibbitts, and it was Hibbitts who—acting through his other corporate entities—sought insurance for the truck from Fremont. Hence, even if GHTC no longer exists, it does not follow that the truck's owner failed to maintain insurance as required by MCL 500.3101(1).

Indeed, the no-fault act defines an "owner" to include a person holding legal title, MCL 500.3101(*l*)(*iii*), as well as a person "having the use of a motor vehicle, under a lease or otherwise, for a period that is greater than 30 days," MCL 500.3101(*l*)(*i*). In this context, "having the use" of the vehicle "means using the vehicle in ways that comport with concepts of ownership," meaning "*proprietary* or *possessory* usage, as opposed to merely incidental usage under the direction or with the permission of another." *Ardt v Titan Ins Co*, 233 Mich App 685, 690-691; 593 NW2d 215 (1999). The person need not actually use the vehicle; instead, "the focus must be on the nature of the person's right to use the vehicle." *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 530; 676 NW2d 616 (2004). Even if Hibbitts never formally transferred title to the truck to his own name, there can be no real debate that Hibbitts—as the sole shareholder of the dissolved GHTC and the individual in control of all the other involved corporations—had the *right* to use the truck. The trial court did not err by concluding that, even if GHTC had ceased to exist, Hibbitts, as an individual, could maintain insurance under MCL 500.3101(1) as the truck's owner.

Second, with regard to the misnomer in the identity of the named insured in the Fremont policy, plaintiffs also question whether Hibbitts—or GHTC—maintained insurance when the named insured on the Fremont policy was "Stewart Trucking, LLC," an entity unassociated with Hibbitts or his other entities. In this regard, it is undisputed that Stewart Trucking, LLC, was instead controlled by an individual with no involvement in this case, who—unlike the father in *Dye*—did not obtain insurance for the truck at Hibbitts's request. Plaintiffs' argument regarding the identity of the named insured is disingenuous.

It is undisputed that Hibbitts controlled several entities, which he used to operate his trucking business. Among those entities were Stewart TRK, LLC, and Beline Trans, LLC. Indeed, his various trucks all bear the "Beline" logo. While plaintiffs focus solely on the policy's reference to "Stewart Trucking, LLC," the Fremont policy more fully identified the named insured as "Stewart Trucking, LLC," doing business as "Beline Trans LLC." Although the policy incorrectly used the word "Trucking" instead of "TRK," this variance is immaterial considering the context in which the insurance was obtained and the other language in the policy. That is, Hibbitts, not anyone associated with Stewart Trucking, LLC, obtained the insurance. Hibbitts provided his own personal information when obtaining the policy, and the policy—particularly in light of the reference to Beline Trans, LLC—was clearly intended for the entity associated with Hibbitts and Beline, namely: Stewart TRK. On these facts, any error in the spelling of Stewart TRK is immaterial. See *Ensley v Coolbaugh*, 160 Mich 299, 303-304; 125 NW 279 (1910).

## D. TERMS OF THE FREMONT POLICY

Next, plaintiffs argue that, even if *Dye* applies and even if the truck's owner could have maintained insurance for the truck through another entity, the Fremont policy would still not provide the requisite coverage because, by its own terms, the policy only provides coverage for vehicles owned by the named insured, which would not include the truck.

"An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 714; 706 NW2d 426 (2005) (quotation marks and citation omitted). To this end, an insurance contract must be read as a whole, giving meaning to all its terms. *Id*. at 715. Words should be given their plain and ordinary meaning. *Id*. And the contract "must be construed so as to give effect to every word, clause, and phrase, and a construction should be avoided that would render any part of the contract surplusage or nugatory." *Id*.

With regard to coverage, the Fremont policy contains a table referred to as "Item Two" that sets forth different types of coverage and a numerical designation indicating what "covered autos" have the type of coverage in question. For property protection insurance, the covered autos have the numerical designation "5." The meaning of these numerical designations is provided in a table on the Business Auto Coverage Form of the policy. As set forth in this table, the number 5 designation refers to "[o]nly those 'autos' you own that are required to have no-fault benefits in the state where they are licensed or principally garaged," including autos that "you acquire ownership of after the policy begins provided they are required to have no-fault benefits . . ." As defined in the policy "the words 'you' and 'your' refer to the Named Insured shown in the Declarations," which in this case is Stewart Trucking, LLC, doing business as Beline Trans, LLC. Because Stewart Trucking, LLC (or Stewart TRK) does not own the truck, plaintiffs argue that the policy does not provide coverage. This argument fails to consider the policy as a whole.

Notably, although the number 5 designation purports to limit coverage to autos owned by the named insured, the policy does not define what it means to "own" an auto. Absent a definition specific to the policy, contract terms are typically "given their commonly used meaning." *Group Ins Co of Mich v Czopek*, 440 Mich 590, 596; 489 NW2d 444 (1992). However, contracts must be read as a whole, and in particular, the declarations page, the application, and the policy itself

must be construed together to determine the parties' intent. *Dancey v Travelers Prop Cas Co*, 288 Mich App 1, 8; 792 NW2d 372 (2010).

In the endorsement declaration, the parties to the policy included a section labeled: "Item Three – Schedule of Covered Autos *You Own*." (Emphasis added). Under a heading of "Covered autos *you own*" (emphasis added), this schedule lists various vehicles and the applicable coverages. Item Three specifically includes the truck at issue as one that the named insured owns, and it specifies that the coverages for the truck include property protection insurance.

Reading Item Three in harmony with the explanation for numerical designation 5, the contract as a whole evinces the parties' agreement that the truck was a covered auto *owned* by the named insured for purposes of the policy. The contracting parties were free to reach their own understanding and agreement regarding what vehicles the named insured "owned" for purposes of the policy, which they did with the adoption of Item Three. Further, there is no question that the truck is required to maintain no-fault insurance. In these circumstances, the truck falls squarely in the parameters set forth for number "5," meaning that the truck is covered for property protection insurance under Item Two. Confirming this fact, as noted, Item Three details the coverages applicable to the truck, and this list of coverages for the truck specifically includes property protection insurance. Reading the contract as a whole, the Fremont policy included the truck in question as a covered auto with property protection insurance. Plaintiffs' arguments to the contrary lack merit.

## E. FRAUD IN THE PROCUREMENT

Plaintiffs also contend that insurance was not maintained as required by MCL 500.3101(1) because the Fremont policy is void of fraud in the procurement of the policy. Plaintiffs emphasize the various entities involved in this case, suggesting that the Hibbitts defendants are engaged in corporate shenanigans and misrepresented the owner of the truck when obtaining insurance. Plaintiffs' fraud argument fails because plaintiffs lack the right to have the contract voided on the basis of any purported fraud by the Hibbitts defendants.[6]

"[F]raud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party." *Bazzi v Sentinel Ins Co*, 502 Mich 390, 408; 919 NW2d 20 (2018). This means that "an insurance policy procured by fraud may be declared void *ab initio* at the option of the insurer." *Id*. "Rescission abrogates a contract and restores the parties to the relative positions that they would have occupied if the contract had never been made." *Id*. at 409. In contrast, "unless rescinded, a voidable contract imposes on the parties the same obligations as if it were not voidable." *Id*. Indeed, "although fraud vitiates all contracts, [a] party who has been induced by fraud to enter into a contract can also elect to affirm the contract and sue for damages . . . ." 27 Williston on Contracts § 69:56 (4th ed.). See also *Gloeser v Moore*, 284 Mich 106, 118; 278 NW 781 (1938). In short, fraud in the procurement does not void a contract *unless* the defrauded party elects to seek rescission. See *Allen v Charlevoix Abstract & Engineering Co*, 326 Mich App 658, 663; 929 NW2d 804 (2019) ("A contract is legally enforceable even if procured by fraud[.]").

---

[6] We agree that *Dye* did not eliminate fraud defenses to insurance coverage, such as fraud in the procurement. But it does not follow that plaintiffs have properly raised the defenses.

-14-

Based on these principles, even assuming some fraud by the Hibbitts defendants in the procurement of the policy, it would be Fremont's option, as the insurer and the wronged party, whether to seek rescission of the policy. See *Bazzi*, 502 Mich at 408-409. At the same time, Fremont would also have the option to elect to affirm the contract; and unless rescinded, the policy remains binding. See *id.*; 27 Williston on Contracts § 69:56 (4th ed.). In contrast, plaintiffs—as nonparties to the contract who were not defrauded by the Hibbitts defendants' representations made long before the events in this case—have no right to seek rescission of the policy to which they were not a party. Cf. *Whitley v Tessman*, 324 Mich 215, 222; 36 NW2d 724 (1949) (concluding that the defendants could not make "themselves the avengers of some alleged wrong" by claiming fraud in a transaction to which they were not a party because "even if there were any merit to the claims of fraud, defendants in no way were defrauded nor have they any right to complain"); *Bowles v Oakman*, 246 Mich 674, 678; 225 NW 613 (1929) (concluding that nonparty to an assignment could not seek to have the assignment declared void as a result fraud, rather the assignment "was at most voidable at the instance of those defrauded").

In addition, plaintiffs have no more right to attempt to invoke the fraud provision in the contract than they have to standing to claim fraud as a basis to void the contract under the common law. "A nonparty to a contract has the right to enforce a promise in a contract where *that promise is made for its benefit.*" *Cenovski, Inc v Mich Mut Ins Co*, 200 Mich App 725, 728; 504 NW2d 722 (1993) (emphasis added). The provision regarding voiding the policy on the basis of the insured's fraudulent misrepresentations is designed to benefit and protect Fremont, not plaintiffs.[7] Moreover, although plaintiffs contend that the fraud provision is "self-effectuating," such an assertion ignores the fundamental freedom of the contract and the fact that parties are *always* free to modify their agreement. *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372; 666 NW2d 251 (2003). Plaintiffs, as nonparties to the agreement, have no right to seek enforcement of this fraud provision when the parties have not elected to do so. See *Cenovski, Inc*, 200 Mich App at 728.

### 1. USE OF A MOTOR VEHICLE

Apart from their contentions that *Dye* should not apply to this case and that the Fremont policy is inapplicable, plaintiffs more generally contest whether their damages arose out of the use of a motor vehicle within the meaning of MCL 500.3121(1). Addressing this issue, and relying on *Mich Millers Mut Ins Co v Lancer Ins Co*, 23 F Supp 3d 850 (ED Mich, 2014), the trial court concluded that damages caused by a fire originating in the engine of a parked truck, that was not being used for any nontransportation purpose, arose out of the use of a motor vehicle as a motor vehicle. Plaintiffs dispute the trial court's conclusion, asserting that their claim of trespass distinguishes this case from that on which the trial court relied.

The "use of a motor vehicle as a motor vehicle" requirement has been explained as follows:

> As a matter of English syntax, the phrase "use of a motor vehicle 'as a motor vehicle' " would appear to invite contrasts with situations in which a motor vehicle is not used "as a motor vehicle." This is simply to say that the modifier "as a motor

---

[7] Fremont has never disavowed the existence of the policy or attempted to void the contract on the basis of fraud by the Hibbitts defendants.

vehicle" assumes the existence of other possible uses and requires distinguishing use "as a motor vehicle" from any other uses. While it is easily understood from all our experiences that most often a vehicle is used "as a motor vehicle," i.e., to get from one place to another, it is also clear from the phrase used that the Legislature wanted to except those other occasions, rare as they may be, when a motor vehicle is used for other purposes, e.g., as a housing facility of sorts, as an advertising display (such as at a car dealership), as a foundation for construction equipment, as a mobile public library, or perhaps even when a car is on display in a museum. On those occasions, the use of the motor vehicle would not be "as a motor vehicle," but as a housing facility, advertising display, construction equipment base, public library, or museum display, as it were. It seems then that when we are applying the statute, the phrase "as a motor vehicle" invites us to determine if the vehicle is being used for transportational purposes. [*McKenzie v Auto Club Ins Ass'n*, 458 Mich 214, 218-219; 580 NW2d 424 (1998).]

Moving vehicles are "quite obviously engaged in a transportational function," *id*. at 221, but vehicular movement is not required to constitute use of a motor vehicle as a motor vehicle. *Id*. at 224-225. Indeed, a vehicle may be engaged in a transportational function while parked. See *Kemp v Farm Bureau Gen Ins Co of Mich*, 500 Mich 245, 261; 901 NW2d 534 (2017). In determining whether injuries arose from a parked vehicle being used as "a motor vehicle," one consideration is whether, "although the vehicle is parked, its involvement in an accident is nonetheless directly related to its character as a motor vehicle." *Id*. at 263 (quotation marks and citation omitted). There is, in other words, a difference between a parked car functioning like any other stationary object that happens to be in "the wrong place at the wrong time" and an accident arising from some qualitative characteristic of a motor vehicle, such as mechanical problems in a parked vehicle causing a fire. Compare *Cincinnati Ins Co v Pennsylvania Gen Ins Co*, 209 Mich App 379, 382; 531 NW2d 741 (1995), with *Heard v State Farm Mut Auto Ins Co*, 414 Mich 139, 148; 324 NW2d 1 (1982). Ultimately, whether injuries arose out of the use of a motor vehicle as a motor vehicle "turns on whether the injury is closely related to the transportational function of motor vehicles." *McKenzie*, 458 Mich at 225-226.

The undisputed facts indicate that the truck was used for transportational purposes—to haul trash for Waste Management. See *Kemp*, 500 Mich at 259-260. It was used for this purpose on the day of the fire and parked near plaintiffs' building shortly before the fire. Further, the truck's function appears to be solely transportational, as this was not a dual-purpose vehicle like those discussed in *McKenzie* that served some other, nontransportational purpose such as "a housing facility, advertising display, construction equipment base, public library, or museum display." See *McKenzie*, 458 Mich at 219. Although the truck was parked at the time of the fire, its role in the accident was not akin to a mere stationary object such as a tree or a wall. Instead, the fire arose from the engine compartment of the truck, a component integral to the transportational function of the truck as a motor vehicle. See *Cincinnati Ins Co*, 209 Mich App at 382; see also *Mich Mut Ins Co v CNA Ins Companies*, 181 Mich App 376, 379, 381-382; 448 NW2d 854 (1989). This sort of spontaneous fire in a vehicle falls within the coverage provided by MCL 500.3121(1). See *Universal Underwriters Ins Group v Auto Club Ins Ass'n*, 256 Mich App 541, 546 n 1; 666 NW2d 294 (2003) (noting that, but for the auto-repair business exception, "spontaneous combustion" of a vehicle awaiting auto repairs at a dealership would have triggered coverage under MCL 500.3121(1)) and *Mich Millers Mut Ins Co*, 23 F Supp 3d at 856-858 (concluding that spontaneous

fire in a parked limo involved use of the limo as a motor vehicle).[8] The trial court did not err by concluding that the requisite nexus existed between the injury and the transportational function of the truck.

Although plaintiffs contend that this nexus is lacking because the Hibbitts defendants did not have permission to park on plaintiffs' property and plaintiffs' complaint includes a claim for trespass, the test under *McKenzie* is a functional test focused on the use of the motor vehicle and whether the injury is closely related to the transportational function of motor vehicles. See *McKenzie*, 458 Mich at 225-226. Even if simply trespassing—i.e., driving onto and parking on plaintiffs' property—the truck was still being used as a motor vehicle. As a tort, trespass is abolished by MCL 500.3135(3) absent evidence that the Hibbitts defendants intentionally caused harm to the property, and no such evidence has been presented. The truck was being used as a motor vehicle for purposes of the no-fault act, and plaintiffs' claim of trespass does not alter this conclusion.

## 2. AUTO-REPAIR BUSINESS EXCEPTION

Even if the damages caused by the fire could be seen as arising from the use of the truck as a motor vehicle, plaintiffs contend that the no-fault act does not provide coverage because the Hibbitts defendants were in the "business of repairing, servicing, or otherwise maintaining motor vehicles." See MCL 500.3101(1).

MCL 500.3101(1) creates an exception to property protection insurance benefits that applies to "vehicle-repair businesses." *Hastings Mut Ins Co v Grange Ins Co of Mich*, 319 Mich App 579, 586; 903 NW2d 400 (2017). *Hastings* involved a fire on a family-operated farm, specifically in a barn where one of the farm employees regularly performed repair and maintenance on farm vehicles as well the family's vehicles. *Id*. at 582. Concluding that the vehicle-repair business exception did not apply to these facts, this Court reasoned that there were no "regular outside customers" and no "fixed price list that would indicate that the farm also operates a vehicle-repair business." *Id*. at 586. Instead, the farm's "primary business enterprise" was farming. *Id*.

Here, the undisputed facts demonstrate that the Hibbitts defendants' primary business enterprise is trucking. Certainly, Hibbitts and his entities benefit from the provision of in-house repairs on the trucks. But these repairs and maintenance activities are peripheral to the primary trucking-business purposes of the Hibbitts defendants. Further, the work is limited to the Hibbitts defendants' trucks, as there was no evidence of outside customers or a fixed price list for services. On the evidence presented, no material questions of fact remained, and the trial court did not err by concluding that the vehicle-repair exception did not apply.[9]

---

[8] Although nonbinding, we, like the trial court, find *Mich Millers Mut Ins Co* persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[9] In the context of their summary disposition arguments related to the Hibbitts defendants, plaintiffs argue that their claim is a casualty claim and that, in these circumstances, plaintiffs' claims were properly brought against the Hibbitts defendants, rather than Fremont, because MCL

## F. LATE-FILED DOCUMENTS

In challenging the grant of summary disposition to the Hibbitts defendants, plaintiffs also argue that the trial court should not have considered Hibbitts's first affidavit or other supporting documents, including the Fremont policy. These documents were filed on July 25, 2019, in support of the Hibbitts defendants' first motion for summary disposition. However, the hearing on the motion was scheduled for July 26, 2019, meaning that these supporting documents were not timely filed. See MCR 2.116(G). Nevertheless, the trial court considered them in its September 2019 decision.

The trial court had discretion to consider these untimely materials, see *Flanagin*, 319 Mich App at 640, and plaintiffs have not shown that the trial court abused that discretion. The materials were clearly relevant to the summary disposition motion, and although untimely, they were nevertheless provided before the hearing, and plaintiffs addressed these materials on the record at the hearing. In other words, plaintiffs did not lack notice of the evidence and were denied a chance to respond before the trial court rendered its decision. See generally *Hughes v Almena Twp*, 284 Mich App 50, 69; 771 NW2d 453 (2009).[10]

On the whole, the trial court did not abuse its discretion by considering the late-filed documents in July 2019, and in any event, plaintiffs are not entitled to relief because the refusal to grant plaintiffs relief on this record does not appear inconsistent with substantial justice. See MCR 2.613(A).

## G. MOTION TO STRIKE

Related to the Hibbitts defendants, plaintiffs lastly assert that the trial court abused its discretion by denying plaintiffs' motion to strike the Hibbitts defendants' affirmative defenses filed on September 19, 2018. According to plaintiffs, the affirmative defenses should have been struck and deemed waived because the Hibbitts defendants failed to provide factual support for their defenses and failed to provide plaintiffs with sufficient notice of the nature of their defenses.

---

500.3030 precludes joining an insurer as a party defendant. However, this case falls squarely within the no-fault act, and MCL 500.3030 "l *Matti Awdish, Inc*, 117 Mich App at 277.

[10] Even assuming that the trial court should not have considered the materials in connection with the motion pending, it is challenging to see how plaintiffs could show prejudice. See MCR 2.613(A). Although the trial court agreed with some of the Hibbitts defendants' arguments in their motion, the trial court *denied* the Hibbitts defendants' motion for summary disposition at the time. Further, after the trial court concluded that *Dye* applied, plaintiffs moved for reconsideration and fully briefed the *Dye* issue as it related to the Fremont policy, and the trial court addressed and considered plaintiffs' arguments in detail when denying reconsideration. See generally *Al-Maliki v LaGrant*, 286 Mich App 483, 486; 781 NW2d 853 (2009). Indeed, as noted, the Hibbitts defendants were not dismissed from the case in 2019, and throughout the remainder of the lower court proceedings plaintiffs continued to address the policy under *Dye* and argue that it was inapplicable.

A motion to strike is provided for by MCR 2.115(B), which states: "On motion by a party or on the court's own initiative, the court may strike from a pleading redundant, immaterial, impertinent, scandalous, or indecent matter, or may strike all or part of a pleading not drawn in conformity with these rules." A motion to strike may be brought "at any reasonable time." *Belle Isle Grill Corp*, 256 Mich App at 471.

"A defense not asserted in the responsive pleading or by motion as provided by these rules is waived, except for the defenses of lack of jurisdiction over the subject matter of the action, and failure to state a claim on which relief can be granted." MCR 2.111(F)(2). However, when, as in this case, a plaintiff files an amended complaint, the responding party is entitled to serve and file an amended response. See MCR 2.118(B). When amended pleadings are filed, "just as an amended complaint supersedes the original complaint, a party's most recent amended answer supersedes any previously filed responsive pleadings." *Grzesick v Cepela*, 237 Mich App 554, 562; 603 NW2d 809 (1999). Following the amendment, prior pleadings are considered "abandoned and withdrawn." *Id.* (quotation marks and citation omitted). These rules regarding amended pleadings apply equally to affirmative defenses, and a party who properly pleads an amended affirmative defense in answer to an amended complaint will not be deemed to have waived that defense on the basis that it was not included in the party's original affirmative defenses. *Robert A Hansen Family Trust v FGH Indus, LLC*, 279 Mich App 468, 477 n 7; 760 NW2d 526 (2008).

Applying these principles, the Hibbitts defendants filed their first set of affirmative defenses on September 19, 2018, and it is these initial defenses about which plaintiffs complain on appeal. However, plaintiffs waited almost two years later, until September 2, 2020, to file their motion to strike in the trial court. This passage of time before filing a motion to strike hardly seems "reasonable," see *Belle Isle Grill Corp*, 256 Mich App at 471, particularly when, in the interim, the parties thoroughly litigated the applicability of the no-fault act in light of the Fremont policy and the Hibbitts defendants filed amended affirmative defenses in October 2019 in response to plaintiffs' second amended complaint, specifically mentioning the no-fault act as plaintiffs assert they were required to do.

Indeed, given the properly filed amended affirmative defenses, there is no longer any relief plaintiffs can receive with respect to the initial affirmative defenses. The amended affirmative defenses supersede the prior affirmative defenses, and the prior pleadings are considered abandoned and withdrawn. See *Grzesick*, 237 Mich App at 562. Plaintiffs' challenge to the Hibbitts defendants' initial affirmative defenses is essentially moot. See *BP 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). And given that the Hibbitts defendants properly filed amended affirmative defenses, failure to more thoroughly plead these defenses in their initial pleading does not operate as a waiver of their defenses. See *Robert A Hansen Family Trust*, 279 Mich App at 477 n 7. Plaintiffs' arguments to the contrary lack merit.

In contrast to plaintiffs' arguments on appeal, the trial court's findings evince no indication of wrongdoing or bad faith by the Hibbitts defendants in their amendment of their affirmative defenses. Instead, the trial court concluded that plaintiffs had long been aware that Fremont insured the Hibbitts defendants, and in fact had demanded payment from Fremont long before filing the current suit. As detailed by the trial court, before filing suit plaintiffs investigated the applicability of the no-fault act, but ultimately decided not to pursue claims under the no-fault act because plaintiff's counsel thought that it did not apply. This record simply does not support

-19-

plaintiffs' claims of wrongdoing or gamesmanship by the Hibbitts defendants. The trial court did not err by denying plaintiffs' motion to strike.

## III. FREMONT

With respect to Fremont, plaintiffs argue that the trial court erred by granting summary disposition to Fremont because, notwithstanding the one-year period of limitations in MCL 500.3145(5), their no-fault claim against Fremont was timely because (1) the relation-back doctrine applies, (2) Fremont fraudulently concealed plaintiffs' no-fault claim, and (3) equitable estoppel precludes Fremont from asserting the statute of limitations as a bar to plaintiffs' claim. Plaintiffs also assert that they may maintain a breach-of-contract action against Fremont as a third-party beneficiary of the policy and that they may pursue a claim for unjust enrichment.

### A. STANDARDS OF REVIEW

Absent a disputed question of fact, the determination of whether a cause of action is barred by the statute of limitations, including questions related to fraudulent concealment, is a question of law that this Court reviews de novo. *Doe v Roman Catholic Archbishop of Archdiocese of Detroit*, 264 Mich App 632, 638; 692 NW2d 398 (2004). The application of doctrines such as equitable estoppel or the relation-back doctrine also present questions of law, which this Court likewise reviews de novo. *Teddy 23, LLC v Mich Film Office*, 313 Mich App 557, 570-571; 884 NW2d 799 (2015); *Local Emergency Fin Assistance Loan Bd v Blackwell*, 299 Mich App 727, 740-741; 832 NW2d 401 (2013). Likewise, whether a claim for unjust enrichment may be maintained presents a question of law, which we review de novo. *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 193; 729 NW2d 898 (2006).

### B. STATUTE OF LIMITATIONS

A claim involving property protection benefits under the no-fault act "may not be commenced later than 1 year after the accident." MCL 500.3145(5). Unlike a claim for PIP benefits, the running of the limitations period for property protection insurance is not tolled by giving notice of injury to the insurer. *Secura Ins Co v Auto-Owners Ins Co*, 461 Mich 382, 387; 605 NW2d 308 (2000). Instead, "[t]he Legislature has decreed that property damage claims must be brought within one year of the accident." *Id*.

Here, the fire occurred on October 13, 2017, so plaintiffs had one year—until October 2018—to file suit for property protection insurance benefits. Plaintiffs did not bring their claim against Fremont until they filed their amended complaint in October 2019, after the limitations period had run. In short, their claim for property protection benefits was untimely under MCL 500.3145(5). However, on appeal, plaintiffs present three reasons why their complaint against Fremont should be considered timely notwithstanding MCL 500.3145(5).

### 1. RELATION-BACK DOCTRINE

First, plaintiffs assert that the relation-back doctrine applies such that their amended complaint in October 2019 relates back to filing their initial complaint against the Hibbitts defendants in July 2018.

-20-

The relation-back doctrine is governed by MCR 2.118(D), and as written "specifies that an amendment relates back to the date of the original pleading only if it 'adds a claim or a defense'; it does not specify that an amendment to add a new party also relates back to the date of the original pleading." *Miller v Chapman Contracting*, 477 Mich 102, 107; 730 NW2d 462 (2007), quoting MCR 2.118(D). In other words, the relation-back doctrine does *not* apply to the addition of new parties. *Id*. at 106. In amending their complaint in October 2019, plaintiffs added new claims and a new party: Fremont. The relation-back doctrine does not apply in these circumstances. *Chapman*, 477 Mich at 106. Consequently, as to Fremont, plaintiffs' amended complaint in October 2019 was not timely under the relation-back doctrine.

## 2. FRAUDULENT CONCEALMENT

Plaintiffs next contend that Fremont fraudulently concealed the existence of the no-fault claim from them, warranting tolling of the period of limitations under MCL 600.5855, which states:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Regarding the application of this provision, this Court has explained:

> Fraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent. [T]he fraud must be manifested by an affirmative act or misrepresentation. Thus, [t]he plaintiff must show that the defendant engaged in some arrangement or contrivance of an affirmative character designed to prevent subsequent discovery. [T]here must be concealment by the defendant of the existence of a claim or the identity of a potential defendant, and the plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment. If there is a known cause of action there can be no fraudulent concealment which will interfere with the operation of the statute, and in this behalf a party will be held to know what he ought to know. . . .

> For a plaintiff to be sufficiently apprised of a cause of action, a plaintiff need only be aware of a possible cause of action. [*The Reserve at Heritage Village Ass'n v Warren Fin Acquisition, LLC*, 305 Mich App 92, 122-123; 850 NW2d 649, (2014) (quotation marks and citations omitted) (alterations in *The Reserve*).]

Whether a plaintiff should have known of a cause of action is judged under an objective standard. *Prentis Family Found, Inc v Barbara Ann Karmanos Cancer Inst*, 266 Mich App 39, 45 n 2; 698 NW2d 900 (2005). "The statute was not designed to help those who negligently refrain from

prosecuting inquiries plainly suggested by facts known . . ." *Id*. (quotation marks and citation omitted).

Here, there is no dispute that the fire originated from a truck, i.e., a motor vehicle, and that the fire originated from the truck had been known to plaintiffs since at least November 2017, when the fire investigation report was issued. Viewed objectively, the fact that a motor vehicle caused their property damages should have put plaintiffs on notice that they had a possible claim for property protection benefits under the no-fault act. Certainly, the nature of the claim was not concealed from them. Further, just days after the fire, Hibbitts told plaintiffs that he was insured through Fremont, and Fremont never denied that fact. In other words, nothing was done to conceal Fremont's identity as a defendant possibly liable for plaintiff's damages.

Moreover, Visser's deposition testimony makes it abundantly clear that plaintiffs investigated—and thus were clearly aware of—the possibility of a claim specifically under the no-fault act. Having actually investigated and rejected a possible cause of action under the no-fault act, it is disingenuous to now claim that Fremont somehow prevented plaintiffs from learning of a possible no-fault claim for property protection benefits. MCL 600.5855 does not apply merely because plaintiffs chose not to pursue a possible claim of which they were clearly aware. See *Prentis Family Found*, 266 Mich App at 45 n 2.

### 3. EQUITABLE ESTOPPEL

We likewise reject plaintiffs argument that Fremont should be equitably estopped from raising the statute of limitations as a bar to plaintiffs' suit.

"[T]he doctrine of equitable estoppel is a judicially created exception to the general rule that statutes of limitation run without interruption. It is essentially a doctrine of waiver that extends the applicable period for filing a lawsuit by precluding the defendant from raising the statute of limitations as a bar." *Cincinnati Ins Co v Citizens Ins Co*, 454 Mich 263, 270; 562 NW2d 648 (1997). Negotiations regarding a claim that are "intended to forestall bringing an action" may be considered an inducement warranting application of equitable estoppel. *Id*. However, to prevail on an estoppel theory, a plaintiff must establish that the defendant "induced it to refrain from bringing an action within the period fixed by statute." *Secura Ins Co v Auto-Owners Ins Co*, 232 Mich App 656, 661; 591 NW2d 420 (1998), aff'd 461 Mich 382 (2000).

Plaintiffs' equitable-estoppel argument fails for the simple reason that, through Bowne, Fremont informed plaintiffs' counsel on August 14, 2018—two months *before* the limitations period expired—that Fremont would not be making payment and that Fremont's damage estimate was not even close to plaintiffs' demands. Bowne even specifically told Visser that plaintiffs "might as well file suit." Plaintiffs indeed presented evidence that, before this denial, Fremont stated that it would cover the claim, subject to proper documentation, and there were discussions of payment between Fremont and plaintiffs' counsel. But the fact nevertheless remains that, after Fremont told them to "file suit," plaintiffs still had two months in which to file suit against Fremont before the period of limitations expired. On this record, no reasonable juror could conclude that Fremont's conduct could have lulled plaintiffs into believing that their claim would be honored after the statutory period, nor that plaintiffs were left "with no alternative but to file its action after the statutory period." Cf. *id*. Equitable estoppel does not apply to these facts. See *id*.

The trial court did not err by dismissing plaintiffs' no-fault claim against Fremont on statute-of-limitations grounds under MCL 500.3145(5).

## C.  BREACH OF CONTRACT

Plaintiffs next argue that the trial court erred by dismissing their breach-of-contract action. According to plaintiffs, they may maintain a breach-of-contract action against Fremont as third-party beneficiaries of the insurance policy.

First of all, regardless of the label they apply to their claim,[11] plaintiffs' claim for payment of property damages arising from the use of the truck as a motor vehicle is a no-fault claim barred by the statute of limitations in MCL 500.3145.  That is, a no-fault claim arises from an insurer's failure to perform a contractual *or* statutory obligation to pay benefits to which insureds are entitled.  See *Cooper v Auto Club Ins Ass'n*, 481 Mich 399, 409; 751 NW2d 443 (2008).  Thus, any claim for insurance benefits under a breach-of-contract theory still falls squarely within the parameters of the no-fault act and is subject to the statute of limitations in MCL 500.3145.  See *Auto-Owners Ins Co v Compass Healthcare PLC*, 326 Mich App 595, 611-613; 928 NW2d 726 (2018) and *Bohlinger v Detroit Auto Inter-Ins Exch*, 120 Mich App 269, 272; 327 NW2d 466 (1982).  In short, even assuming plaintiffs could pursue a breach-of-contract claim for property protection benefits under the Fremont policy, that claim is time-barred by MCL 500.3145.

In any event, the trial court correctly determined that plaintiffs are not intended third-party beneficiaries of the contract, and as such, they cannot sue Fremont on a breach-of-contract theory.  Under MCL 600.1405, a nonparty to a contract may sue to enforce a contract only if he or she qualifies as an intended third-party beneficiary.  *Farm Bureau Ins Co v TNT Equip, Inc*, 328 Mich App 667, 674; 939 NW2d 738 (2019).  "A person is a third-party beneficiary of a contract only if the contract establishes that a promisor has undertaken a promise directly to or for that person." *Id*.  See also MCL 600.1405(1).  In contrast to intended beneficiaries, incidental third-party beneficiaries may not sue to enforce a contract.  *Schmalfeldt v North Pointe Ins, Co*, 469 Mich 422, 429; 670 NW2d 651 (2003).  The contract itself determines whether a party is an intended third-party beneficiary within the meaning of MCL 600.1405(1).  *Id*. at 428.

There is nothing in the contract—and plaintiffs do not even attempt to identify any language in the contract—that would evince a promise directly for plaintiffs' benefit.  Instead, plaintiffs are, at most, part of a broad class that may incidentally benefit from the existence of the property protection insurance coverage if certain circumstances exist.  See *id*. at 428-429; *Farm Bureau Ins Co*, 328 Mich App at 681-682.  As incidental beneficiaries, plaintiffs may not maintain a breach-of-contract action directly against Fremont.  See *Schmalfeldt*, 469 Mich at 429; *Farm Bureau Ins Co*, 328 Mich App at 681-682.  The trial court properly dismissed plaintiffs' breach-of-contract claim.

---

[11] We are not bound by the label of a party's claim and will instead consider the gravamen of the suit by reading the complaint as a whole.  *Stephens v Worden Ins Agency, LLC*, 307 Mich App 220, 229; 859 NW2d 723 (2014).

## D. UNJUST ENRICHMENT

For similar reasons, the trial court also properly dismissed plaintiffs' claim for unjust enrichment. Again, regardless of the label for their claim, plaintiffs fundamentally seek payment for property damage arising from the use of a truck as a motor vehicle. This claim falls squarely within the no-fault act. Plaintiffs cannot simply relabel their no-fault claim as one for unjust enrichment to avoid the applicable statute of limitations. Cf. *Citizens Ins Co of Am v Univ Physician Group*, 319 Mich App 642, 651-652; 902 NW2d 896 (2017). In any event, on the merits, plaintiffs' unjust-enrichment claim also fails.

> The elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit. In such instances, the law operates to imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter. [*Bellevue Ventures, Inc v Morang-Kelly Inv, Inc*, 302 Mich App 59, 64; 836 NW2d 898 (2013).]

Typically, the rule that an implied contract will not be found when an express contract exists applies when there is an express contract between *the same parties* on the same subject matter. *Morris Pumps*, 273 Mich App at 194-195. The remedy for unjust enrichment is restitution to restore "a party who yielded excessive and unjust benefits to his or her rightful position." *Wright v Genesee Co*, 504 Mich 410, 419; 934 NW2d 805 (2019).

In granting summary disposition to Fremont, the trial court found that there was an express insurance contract governing the availability of no-fault benefits. However, even assuming that the trial court erred by relying on the existence of an express contract as a basis for denying plaintiffs' unjust-enrichment claim, the trial court correctly recognized that plaintiffs' claim failed because they did not confer any benefit on Fremont. That is, plaintiffs wholly fail to identify any benefit that Fremont received through any action by *plaintiffs*. If Fremont received any benefit, it was the insurance premiums for the policy, which were paid by the Hibbitts defendants, not plaintiffs. Cf. *Karaus v Bank of New York Mellon*, 300 Mich App 9, 23; 831 NW2d 897 (2012). Plaintiffs, in comparison, conferred no benefit whatsoever on Fremont. At most, plaintiffs generally contend that Fremont's failure to pay benefits results in some inequity, but courts cannot "create substantive rights under the guise of doing equity, or confer rights where none exists." *Henry v Dow Chem Co*, 473 Mich 63, 97; 701 NW2d 684 (2005) (quotation marks and citation omitted). Equity alone does not provide support for plaintiffs' unjust-enrichment claim in the absence of a showing that plaintiffs conferred a benefit on Fremont. The trial court properly dismissed plaintiffs' claim for unjust enrichment.

## IV. FREMONT'S CROSS-APPEAL

As noted, Fremont filed a cross-appeal in this Court, challenging the trial court's denial of Fremont's motion to compel discovery of plaintiffs' tax returns as relevant to the question of plaintiffs' damages. Fremont concedes that this issue is only relevant if we reverse the trial court's grant of summary disposition to Fremont. Having concluded that the trial court properly granted summary disposition to Fremont, we find it unnecessary to address Fremont's cross-appeal.

Affirmed.

/s/ Stephen L. Borrello
/s/ Kathleen Jansen
/s/ Christopher M. Murray